# EXHIBIT A

# FRANCHISE AGREEMENT

BETWEEN

# G.C. FRANCHISING SYSTEMS, INC.
**FRANCHISOR**

AND

## David Kelly
**FRANCHISEE(S)**

FRANCHISE LOCATION NO. <u>75750</u>

TABLE OF CONTENTS

Article                                                                    Page No.

 1    APPOINTMENT ..............................................................    1

 2    TERM AND RENEWAL .....................................................    4

 3    LOCATION OF BUSINESS ...............................................    5

 4    FRANCHISE FEE .............................................................    5

 5    MONTHLY FEES ..............................................................    6

 6    DUTIES OF FRANCHISOR .................................................    8

 7    DUTIES OF FRANCHISEE .................................................    9

 8    PROPRIETARY MARKS .....................................................   19

 9    CONFIDENTIAL MANUAL ..................................................   21

10    CONFIDENTIAL OR PROPRIETARY INFORMATION .............   22

11    ADVERTISING ................................................................   23

12    TRANSFERABILITY OF INTEREST .......................................   29

13    TERMINATION ...............................................................   33

14    OBLIGATIONS UPON TERMINATION ...................................   36

15    COVENANTS ..................................................................   37

16    ENFORCEMENT .............................................................   40

17    INDEPENDENT CONTRACTOR AND INDEMNIFICATION ........   41

18    MISCELLANEOUS ...........................................................   42

      Exhibit A................................................. Identification of Franchisee(s)
      Exhibit B.................................................................... Territory

THIS FRANCHISE AGREEMENT is between G.C. FRANCHISING SYSTEMS, INC., an Ohio corporation (the "Franchisor"), and the individual(s) or entity identified on Exhibit A attached hereto and by this reference incorporated herein (hereinafter collectively and individually referred to as the "Franchisee"),

RECITALS:

A.    Franchisor has created and developed and is in the process of further developing a system (the "System") for the establishment and operation of a distinctive type of business that offers business coaching, management and personal development coaching and consulting services to business owners, business managers, executives and self-employed professionals (hereinafter referred to as a "Growth Coach franchise").

B.    The System consists of distinctive methods and procedures for marketing and advertising; specially designed business forms and procedures for the efficient operation of the franchised business; an operating manual (the "Manual") and training course; and specially designed procedures for the promotion and provision of the Franchisee's services.

C.    Franchisor has the exclusive right to use the service mark GROWTH COACH®, THE STRATEGIC MINDSET®, any derivatives thereof, and certain other trade names, business names, service marks, trademarks, logos and trade symbols (the "Marks") as are now or may from time to time be designated in writing by Franchisor for the use by Franchisee in the operation of its Franchise under the System.

D.    Franchisor continues to develop, use, and control the use of the Marks in order to identify to the public the source of products and services marketed thereunder and under the System, and to represent the System's high standards of quality, appearance, and services.

E.    Franchisee understands and acknowledges the importance of Franchisor's high standards of quality, service, and appearance, and the necessity of opening and operating the franchised business in conformity with Franchisor's standards and specifications presented in all manuals and corresponding updates.

F.    Franchisee has indicated to Franchisor its desire to serve as Franchisee.

THEREFORE the parties agree as follows:

ARTICLE 1

APPOINTMENT

1.1    Grant of Franchise. Franchisor hereby grants to Franchisee, upon the terms and conditions herein contained, (i) the right and franchise, and Franchisee undertakes the obligation, to operate a business management and personal development coaching and consulting business (hereafter referred to as the "franchised business") using Franchisor's System and (ii) a non-exclusive license to use the Marks and the System as they may be changed, improved and further developed from time to time, only within the territory described in Section 1.2 (the "Territory").

1.2    Territory Defined. The Territory is a geographical area delineated by Postal ZIP Codes and more particularly described on an exhibit ("Exhibit B") to be attached to, incorporated in, and made a part of this Agreement. The parties shall determine the specific boundaries of the Territory within thirty days after Franchisee's successful completion of the initial training program described in Section 7.1 of this Agreement. If Franchisor and Franchisee fail to agree upon the specific

boundaries of the Territory within thirty days after Franchisee's successful completion of the initial training program, then either party may terminate this Agreement upon written notice to the other party, whereupon Franchisor shall refund the Franchise Fee paid by Franchisee less the sum of $15,000.00, which Franchisor and Franchisee agree is a fair and reasonable sum to compensate Franchisor for expenses incurred in connection with the sale of the franchise to Franchisee, the investigation of Franchisee's qualifications and credit, the removal of the Territory from the market, and Franchisor's lost or deferred opportunity to franchise the Territory to others, plus a fair and reasonable sum to compensate Franchisor for providing the training described in Section 7.1. If for any reason the boundaries or numbers of any ZIP Code(s) that comprise the Territory are moved, altered or eliminated, Franchisor shall re-define the boundaries of the Territory to correspond as nearly as possible, in Franchisor's sole and absolute discretion, to Franchisee's original Territory, and Franchisor's decision shall be final and binding upon both Franchisor and Franchisee. Franchisee shall not relocate the franchised business from the Territory described in Exhibit B without the prior written approval of Franchisor. Franchisee shall operate the franchised business only within the Territory described on Exhibit B. If Franchisee transfers the Franchise pursuant to Article 12 of this Agreement, then Franchisor may modify the size of the Territory at the time of transfer so that the Territory will be consistent with the size of franchise territories offered in Franchisor's then-current disclosure document.

1.3    <u>Franchisor Restrictions</u>.  Franchisor shall not establish nor franchise another to establish a business substantially similar to the franchised business within Franchisee's Territory during the term of this Agreement.  Franchisee acknowledges that this Franchise is otherwise non-exclusive and is granted subject to the terms and conditions of this Article 1 and Section 8.6 below.  Except as expressly described in this paragraph, Franchisee does not have any "exclusive territory" or any "exclusive," "protected," or "reserved" territorial or similar rights, and there is and will be no limitation on Franchisor's rights to locate and consent to the location of other Growth Coach Franchises or other facilities of any type at any location, regardless of the distance from, impact on, or vicinity of, the franchised business or the number of Growth Coach Franchises in an area or market.  Except as permitted by Sections 1.4 and 1.5 below, Franchisee shall not provide or sell products or services in, or to customers located in, a franchise territory granted to another franchisee of the System.  Franchisee acknowledges that the territorial restrictions in this paragraph do not extend to the solicitation of employees, and nothing in this agreement prohibits other franchisees of Franchisor from advertising for and soliciting employees in Franchisee's Territory (subject to Section 15.2(c) below).  Franchisee's right to exclusively operate the franchised business within Franchisee's Territory (subject to Sections 1.4 and 1.5 below) shall begin once Franchisee has completed Franchisor's initial training program (see Section 7.1 below) and the franchised business has become fully operational.

1.4    <u>National Accounts</u>.  The rights granted to Franchisee by this Agreement do not include the exclusive right to offer or provide products or services to National Accounts, and National Accounts are hereby specifically excluded from Franchisor's territorial restrictions in Section 1.3 above. Franchisee acknowledges that other franchisees of the System may provide products and services to National Accounts at or from locations in Franchisee's Territory.  With Franchisor's prior written consent, Franchisee may provide products and services to National Accounts at or from locations in a franchise territory granted to another franchisee of the System, if, and only if, that franchisee's franchise agreement contains a provision similar to this Section 1.4 excluding National Accounts or otherwise permitting other franchisees of the System to provide products and services at or from locations in the franchisee's territory.  A "<u>National Account</u>" is a business with ten or more franchised or company-owned locations, or an association with ten or more members, in more than one state or in more than one standard metropolitan statistical area.  Franchisor retains the sole and exclusive right to identify clients or potential clients as National Accounts, to service National Accounts, and to award the right to service National Accounts to any franchisee of the System, in

Franchisor's sole and absolute discretion. All disputes between franchisees of the System relating to National Accounts will be resolved by Franchisor, whose decision will be final and binding upon all parties.

1.5    Shared Referral Sources.    The rights granted to Franchisee by this Agreement do not include the exclusive right to solicit referrals from and promote services to Shared Referral Sources, and Shared Referral Sources are hereby specifically excluded from Franchisor's territorial restrictions in Section 1.3 above. Franchisee acknowledges that other franchisees of the System may solicit referrals from and promote their services to Shared Referral Sources located in Franchisee's Territory. Likewise, Franchisee may solicit referrals from and promote its services to Shared Referral Sources located in a franchise territory licensed to another franchisee of the System. A "Shared Referral Source" is a person or organization that: (i) because of its purpose or the nature of its business, frequently encounters opportunities to recommend, to its customers, clients, members, or to the general public, providers of services similar to the services offered by a Growth Coach franchise; and (ii) though it may be physically located within one franchise territory, serves a geographic area larger than that franchise territory. Examples of Shared Referral Sources (by way of illustration and not limitation) are bankers, attorneys, accountants, consulting firms, and other business professionals and publications of a general circulation. Franchisor retains the sole and exclusive right to identify Shared Referral Sources on a case-by-case basis, in Franchisor's sole and absolute discretion. All disputes between franchisees of the System relating to Shared Referral Sources will be resolved by Franchisor, whose decision will be final and binding upon all parties. Nothing in this paragraph authorizes or permits Franchisee to offer, sell or provide Permitted Products and Services outside the Territory described in Exhibit B, or to sell or provide products or services to a Shared Referral Source located in a franchise territory licensed to another franchisee of the System.

1.6    Clients. Franchisee acknowledges and agrees that it acquires no rights in or to its clients or client list other than those specifically granted under this Agreement. Upon the expiration or termination of this Agreement for any reason, Franchisor may notify Franchisee's clients thereof and, without compensation to Franchisee, authorize one or more other Growth Coach franchisees or any other third party to provide personal emergency response products or services to Franchisee's former clients. If a franchisee provides Permitted Products and Services in a franchise territory before Franchisor grants such territory to a new franchisee, then Franchisor may, in its discretion, allow the pre-existing franchisee to continue to provide Permitted Products and Services to pre-existing clients, but the pre-existing franchisee may not thereafter solicit or accept new clients in any part of the new franchisee's franchise territory.

1.7    Permitted Activities.    The rights granted to Franchisee under this Agreement are limited to the sale of Permitted Products and Services to clients within the Territory. Franchisee shall not promote, offer, sell, provide, or distribute any other goods or services without Franchisor's prior written approval.

1.8    Reserved Rights of Franchisor.    Franchisor specifically reserves all rights not expressly granted to Franchisee in this agreement.

1.9    Acquisition of Competing System.    If Franchisor merges with, acquires, or is acquired by another system of businesses, the continued operation of any branch, franchise, or location of the other system within the Territory under any trade name, trademark, brand name, or commercial symbol other than the Marks will not violate the rights granted to Franchisee by section 1.3.

1.10    Marketing and Solicitation Restrictions.    Franchisee will not directly or indirectly market to or solicit, or provide services to, clients whose principal residence is inside the protected territory of

any other Growth Coach franchisee. If Franchisee services such a client, then Franchisee will be in violation of this Franchise Agreement. Within 10 days of receiving written notice of such violation, Franchisee must submit all Gross Revenues earned from servicing such clients to Franchisor.

ARTICLE 2

TERM AND RENEWAL

2.1    Initial Term. Except as otherwise provided, the term of this Agreement shall commence on the Effective Date (as defined in the last paragraph of this Agreement) and expire on the tenth anniversary of the Effective Date.

2.2    Renewal. Franchisee may, at its option, renew the license granted under this Agreement for two additional consecutive terms of ten years each, provided that Franchisee complies with the following requirements:

(a)    Franchisee shall give Franchisor written notice of its election to renew not less than six months, but not more than one year, prior to the tenth anniversary of the Effective Date;

(b)    Franchisee is not in default under any provision of this Agreement, any amendment hereof or successor hereto, or any other agreement or instrument between Franchisor and Franchisee, and has substantially complied with all of the terms and conditions of all such agreements during the respective terms thereof;

(c)    Franchisee shall execute Franchisor's then current form of Franchise Agreement (with appropriate modifications to reflect the fact that it relates to the renewal of a franchise), which will supersede in all respects this Agreement, and the terms of which may differ from the terms of this Agreement, including, without limitation, different rates for National Branding Fees and Royalties, except that Franchisee will not be required to pay an initial franchise fee required or its equivalent;

(d)    If permitted by the laws of the state in which Franchisee is located, Franchisee shall execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its subsidiaries and affiliates, and their respective officers, directors, agents and employees, in their corporate and individual capacities; and

(e)    Franchisee shall comply with Franchisor's then current qualification and training requirements, including, without limitation, any training requirements specifically designed for renewing Franchisees.

2.3    Continued Operation Following Expiration. Unless Franchisee exercises its option to renew the license granted under this Agreement in accordance with this Article, Franchisee has no right to continue to operate the franchised business after the Expiration Date. If Franchisor permits Franchisee to continue to operate the franchised business after the Expiration Date, but before the execution by Franchisee of a new franchise agreement for a new term as required by Section 2.2(c) above, then the temporary continuation of the franchised business will be on a month-to-month basis, and will be terminable at the will of Franchisor by giving Franchisee written notice of termination at least thirty days before the termination is effective. If the laws of the jurisdiction in which the Franchisee is located require a longer notice period, the thirty-day period will be deemed

modified to be the shortest notice period required by the laws of such jurisdiction. If Franchisor permits Franchisee to renew the license granted under this Agreement after a month-to-month continuation of the franchised business, then Franchisee must pay to Franchisor a fee of $1,000 per month for every month of month-to-month operation after the Expiration Date, up to Franchisor's then-current initial franchise fee.

## ARTICLE 3

### LOCATION OF BUSINESS

Franchisee shall lease, purchase or otherwise secure suitable premises for the operation of the franchised business (the "Premises"). Franchisee may operate the franchised business from Franchisee's residence if permitted by, and so long as Franchisee fully complies with, all applicable building, zoning and licensing laws, ordinances, requirements and restrictions. If the residence used as the Premises is located outside the Territory, Franchisee shall, before opening the franchised business, obtain and maintain at all times during the Term a mailing address located in the Territory. If the Premises are not the residence of Franchisee or a principal of Franchisee, the Premises must be located in the Territory. Franchisee shall provide Franchisor with the address of the Premises and shall notify Franchisor promptly in writing of any change in the location of the Premises, any change in Franchisee's business address, or any change in Franchisee's e-mail address or business telephone number.

## ARTICLE 4

### FRANCHISE FEE

4.1     Amount of Franchise Fee.   Franchisee shall pay to Franchisor a "Franchise Fee" of $45,900[1]. The Franchise Fee is fully earned, due and payable to Franchisor upon the execution of this Agreement, in consideration of, among other things, the administrative and other expenses incurred by Franchisor in furnishing items to Franchisee as described in Article 6 and for Franchisor's lost or deferred opportunity to franchise to others. Except as provided in Section 1.2 above, the Franchise Fee is not refundable.

4.2     Payment of Franchise Fee. The Franchise Fee is payable as follows:

(a)     Franchisee shall pay the Franchise Fee to Franchisor at the time Franchisee executes the Franchise Agreement.

(b)     If Franchisee meets Franchisor's credit standards, Franchisee may pay the balance of the Franchise Fee by executing a promissory note (the "Installment Note") and by paying Franchisor  $_____ in cash, check, money order or bank draft concurrently with the execution of this Agreement. The maximum principal amount of the Installment Note is $20,000.00. The Installment Note for the balance of the Franchise Fee is $_____ plus simple interest at the rate of 10% per year, and will be payable in ____ monthly installments of $_____ each. The first installment shall be due and payable on the first day of the month immediately following the first full month in which Franchisee completes the initial training program.

_____

(c)     Franchisee may (or, if Franchisee fails to meet Franchisor's credit standards, shall) pay the entire amount of the Franchise Fee in cash or by check, money order or bank draft at the time of executing this Agreement, in which event the Franchise Fee is discounted to $39,900.

ARTICLE 5

MONTHLY FEES

5.1     <u>Royalty</u>.     Solely in consideration of Franchisee's continued right to use the Marks, Franchisee shall pay Franchisor a monthly royalty fee of 8% of Franchisee's Gross Revenues (the "Royalty"), or $500.00 per month (the "Minimum Royalty"), whichever is greater.  Royalties are due on the 5th day of each month based upon the Gross Revenues of the preceding calendar month.  The payment of Royalties shall commence on the 5th day of the month immediately following the first full month in which Franchisee completes the initial training program (unless Franchisee purchases an existing Franchise from a third-party rather than from Franchisor, in which event Franchisee shall be obligated to pay the Minimum Royalty on the 5th day of the first month immediately following the month in which Franchisee purchased the Franchise Territory).

5.2     <u>National Branding Fee</u>.  Franchisee shall pay, to Franchisor or to such national and/or regional national branding fund(s) as Franchisor may establish in accordance with Article 11 of this Agreement, a national branding fee of $250.00 per month (the "<u>National Branding Fee</u>"), payable by the fifth day of each month beginning on the fifth day of the month immediately following the first full month in which Franchisee completes the initial training program (unless Franchisee purchases an existing Franchise from a third-party rather than from Franchisor, in which event Franchisee shall be obligated to pay the National Branding Fee on the 5th day of the first month immediately following the month in which Franchisee purchased the Franchise Territory).  Franchisor has the right to increase the amount of the National Branding Fee at any time in its sole discretion.  Any increase in the National Branding Fee will be effective thirty days after Franchisee's receipt of written notice thereof.

5.3     <u>Late Payment</u>.  Franchisee shall pay to Franchisor a late fee of $50.00 or 10% of the amount due, whichever is greater, on each Royalty or National Branding Fee payment that is not received by Franchisor within five days after the due date.  Any such payments that are not received by Franchisor within thirty days after the same become due shall bear interest at the rate of 18% per annum, or the highest rate allowed by law, whichever is lower, from the date payment is due to the date payment is received by Franchisor, regardless of any subordinate agreement that may be in effect to postpone payment of Royalties or National Branding Fees.

5.4     <u>Gross Revenues</u>.  The term "<u>Gross Revenues</u>" means all income (cash, credit, and all other consideration) received by Franchisee or any spouse or child of Franchisee or its principal: (i) in connection with the operation of the franchised business or any competing business; (ii) from the sale of any authorized products or services (as modified from time-to-time by Franchisor in accordance with this Agreement); or (iii) from the sale of goods or services under, using, or in connection with the Marks.  "Gross Revenues" does not include value-added, sales, use, excise, or other  taxes that are separately stated and that Franchisee is required by law to collect and does collect from clients and pays to any governmental taxing authority.

5.5     <u>Method of Payment</u>.

(a)     Franchisee shall make all payments to Franchisor at such address as Franchisor may provide to Franchisee.  Franchisor reserves the right to require Franchisee to make all

payments to Franchisor, including Royalties, National Branding Fees, interest, late fees, and legal expenses, through an electronic depository transfer account ("EDT Account") established at a national banking institution approved by Franchisor. At such time as Franchisor may require, Franchisee shall establish the EDT Account and execute and deliver to Franchisor an authorization for electronic funds transfer for direct debits from the EDT Account. At all times thereafter during the term of this agreement, Franchisee shall ensure that Franchisor has access to Franchisee's EDT Account for purposes of receiving electronic funds transfer payments, and Franchisee shall comply with procedures specified by Franchisor and perform such acts as may be necessary to accomplish payment by electronic funds transfer. Franchisee hereby authorizes Franchisor to initiate debit entries and credit correction entries to the EDT Account for payment of Royalties, National Branding Fees, interest, late fees, legal expenses, and any other amounts payable to Franchisor or any affiliate of Franchisor. Franchisee shall make funds available to its EDT Account in sufficient amounts to meet its obligations as they become due. If any debit properly initiated by Franchisor from Franchisee's EDT Account is denied or charged back due to nonsufficient funds or the closing of the EDT Account, Franchisee shall (1) pay Franchisor a $50 charge-back fee, (2) reimburse Franchisor for all bank and transaction charges incurred by Franchisor as the result of the charge-back, and (3) pay interest on the unpaid amount going back to the fifth day of the month in which the payment was due. Franchisee may not close the EDT Account without Franchisor's consent. Franchisee reserves the right to require Franchise to remit payments in any manner other than through the EDT Account.

(b)     If Franchisee has not timely reported Franchisee's Gross Revenues to Franchisor for any reporting period, then Franchisor shall debit Franchisee's EDT Account by an amount equal to the prescribed fee, plus 125% of the Royalty and National Branding Fee that Franchisor was entitled to debit in the prior reporting period. If the amounts debited are less than the amounts Franchisee actually owes (once Franchisor determines Franchisee's true Gross Revenues for the reporting period), Franchisor shall debit the EDT Account for the balance of the Royalty and National Branding Fee due on the date specified by Franchisor. If the amounts debited are greater than the amounts Franchisee actually owes (once Franchisor determines Franchisee's true Gross Revenues for the reporting period), Franchisor shall credit the excess against the amount Franchisor otherwise would debit from the EDT Account during the following month, without interest. Nothing in this paragraph is to be construed to waive, postpone, or suspend Franchisee's obligations to submit any reports, records, or other materials required by this agreement. Franchisee acknowledges that its failure to accurately report Gross Revenues when due constitutes a breach of this agreement, notwithstanding the provisions of this paragraph.

5.6     <u>Taxes on Amounts Paid to Franchisor</u>. All payments required to be made by Franchisee to Franchisor shall be the gross amount determined according to the applicable paragraph, without deduction for any sales, use, withholding, gross receipts, income, or other taxes that may be levied or assessed on the payments by any state, county, or municipality in which the franchised business is located or operates, in which Franchisee is domiciled, or which otherwise possesses the power to tax Franchisee or the franchised business. Franchisee shall remit to the appropriate taxing authorities all sales, use, withholding, gross receipts, income, or other taxes levied or assessed on amounts paid by Franchisee to Franchisor which would otherwise be due from Franchisor, shall promptly deliver to Franchisor receipts of applicable governmental authorities showing that all such taxes were properly paid in compliance with applicable law, and shall indemnify and defend Franchisor and hold Franchisor harmless from and against all liability for such taxes (including interest and penalties thereon). Franchisee shall fully and promptly cooperate with Franchisor to

provide such information and records as Franchisor may request in connection with any application by Franchisor to any taxing authority with respect to any tax credits.

5.7 <u>Application of Payments</u>. As to Franchisee, Franchisor has the right to: (i) apply any payments received to any past-due, current, or future indebtedness of any kind, regardless of any instructions for the application of the payment from Franchisee or anyone else; (ii) set off from any amounts that may be owed by Franchisor, any amount owed to Franchisor or any National Branding Fund; and (iii) retain any amounts received for Franchisee's account, whether rebates from suppliers or otherwise, as a payment against any amounts owed to Franchisor. Franchisor may exercise any of these rights in connection with amounts owed to or from Franchisor, any Franchisor-Related Person, and/or any National Branding Fund.

ARTICLE 6

DUTIES OF FRANCHISOR

6.1 <u>Assistance by Franchisor</u>. Franchisor, at its sole expense and cost, shall, following the execution of this Agreement, provide the following assistance and materials to Franchisee:

    (a)    A schedule of all equipment necessary to operate a Franchise;

    (b)    Initial training for up to two persons, one of which has been approved by Franchisor as the person responsible for the day-to-day operation of the franchised business, for up to a one-week period at one of Franchisor's approved training facilities;

    (c)    A current set of advertising and promotional templates;

    (d)    Approved and readily available sources for purchasing supplies, advertising and marketing materials, computer hardware and software, and other items necessary for the operation of a Franchise;

    (e)    Periodic assistance from Franchisor's representatives via telephone or electronic mail to the extent Franchisor deems necessary; and

    (f)    Such other materials, information and assistance as Franchisor may from time to time deem necessary.

6.2 <u>Products, Supplies and Materials</u>. Following the execution of this Agreement, Franchisor will furnish Franchisee with one copy of each of the business and reporting forms for use by Franchisee in the franchised business. Thereafter, Franchisee may purchase additional amounts of any of the business and reporting forms from any approved supplier. At its election, Franchisor may provide the forms in a digital format. Upon request, Franchisor will provide Franchisee with specifications for the proper preparation of the business and reporting forms, and Franchisee shall have the option to purchase from a supplier who has complied with Franchisor's supplier approval guidelines as described in Section 7.5 of this Agreement. Since all business and reporting forms will bear the Marks, each supplier shall also be required to execute a License Agreement setting forth the manner in which the Marks are to be imprinted, the required text on such materials, and other necessary specifications and standards for the preparation of such materials.

6.3 <u>Manual</u>. Franchisor shall loan Franchisee, at no charge to Franchisee, one copy of Franchisor's current Manual (which may consist of one or more volumes and may be provided digitally via a franchisee intranet, compact disk or DVD) as described in Article 9 of this Agreement.

ARTICLE 7

DUTIES OF FRANCHISEE

7.1 <u>Training</u>. At least one person designated by Franchisee, who has been approved by Franchisor as the person responsible for the day-to-day operation of the franchised business, but not more than two persons, must complete, to Franchisor's satisfaction, Franchisor's initial training program described in Section 6.1(b) herein. In connection with the initial training program, Franchisor shall provide and pay for the instructors, training facilities, and training materials utilized in such training. Franchisee shall be responsible for all other expense incurred by Franchisee or its trainees, including, without limitation, the cost of travel, room, board and wages. If Franchisee (or Franchisee's designee) fails to complete the training program to the satisfaction of Franchisor, or fails to begin the training program within ninety days after the execution of this Agreement, then Franchisor shall have the right to terminate this Agreement. At least one person designated by Franchisee, who has been approved by Franchisor as the person responsible for the day-to-day operation of the franchised business, also shall attend and complete, to Franchisor's satisfaction, such other training programs as Franchisor may reasonably require from time to time. Franchisor, at its option, may charge Franchisee a fee for such training. In connection with such training, Franchisee shall be responsible for all expenses incurred by Franchisee or its trainees, including, without limitation, the cost of travel, room, board and wages, and any training fee charged by Franchisor.

7.2 <u>System Standards</u>. Franchisee acknowledges and agrees that every detail of the System is important, not only to Franchisee but also to Franchisor and other Growth Coach franchisees, in order to develop and maintain high and uniform operating standards, to increase the demand for the products and services offered by all franchisees, to establish and maintain a reputation for uniform, efficient, high quality services, and to protect the goodwill of all Growth Coach franchises. Franchisee further acknowledges and agrees that a fundamental requirement of the System, this Agreement, and other Growth Coach franchises is adherence by all franchisees to the uniform specifications, standards, operating procedures and rules prescribed by Franchisor for the development and operation of the franchised business (hereafter referred to as "<u>System Standards</u>"). Accordingly, Franchisee agrees to comply with each and every System Standard, as periodically modified and supplemented by Franchisor in its sole and absolute discretion, during the term of this Agreement. Franchisee further agrees that System Standards prescribed from time to time in the Manual, or otherwise communicated to Franchisee in writing, shall constitute provisions of this Agreement as if fully set forth in this Agreement. All references to this Agreement include all System Standards as periodically modified.

7.3 <u>Products and Services</u>. Franchisee shall offer and sell all products and services, and only those products and services, authorized by Franchisor and specified in the Manual or as designated in writing by Franchisor ("<u>Permitted Products and Services</u>"). Franchisor may unilaterally add and delete products or services to or from the Permitted Products and Services at any time. Franchisor may also designate any products or services as optional.

7.4 <u>Fixtures and Furnishings</u>. Franchisee shall purchase and install, at Franchisee's expense, all fixtures, furnishings, signs, computer hardware and peripherals ("<u>Computer System</u>"), computer software ("<u>Designated Software</u>"), and other equipment as may be specified by the System Standards from time to time; and shall not permit the installation of any fixtures, furnishings, signs,

Computer System, Designated Software, or other equipment not conforming to the System Standards.

7.5    Supplier Approval.  Franchisee shall purchase all marketing materials, business cards, business stationary and services used in the franchised business solely from suppliers who demonstrate to Franchisor's continuing reasonable satisfaction the ability to meet Franchisor's then current standards and specifications (including pricing) for such items; who possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably; and who have been approved, in writing, by Franchisor and not thereafter disapproved.  If Franchisee desires to purchase any items from an unapproved supplier, Franchisee shall submit to Franchisor, by certified mail, return receipt requested, a written request for approval or shall request the supplier itself to do so.  Franchisor shall have the right to require that its representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered to Franchisor. Franchisor shall notify Franchisee of Franchisor's approval or disapproval within thirty days after Franchisor's receipt of all information requested by Franchisor.  Franchisor has the right to condition its approval of any supplier upon benefits to Franchisor and/or its affiliates based upon purchases by Franchisee and/or other Growth Coach franchisees.  Franchisor and/or its affiliates may derive income or receive benefits as a result of Franchisee's and/or other Growth Coach franchisees' purchase of items.  Franchisor reserves the right, at its option, to re-inspect the facilities and products of any such approved supplier, and to revoke its approval upon the supplier's failure to continue to meet any of Franchisor's criteria.  Franchisor may require Franchisee to purchase certain goods or services exclusively from one or more designated suppliers, or to purchase cooperatively with Franchisor or other franchisees of the System, in order to maintain Franchisor's quality standards or to take advantage of price discounts, benefits or other legitimate sales incentives.  Franchisor and/or its affiliates have the right to receive rebates, discounts, allowances, and other payments from suppliers in respect of group purchasing programs and otherwise on account of the suppliers' dealings with Franchisee and other Growth Coach franchisees, which Franchisor is entitled to retain and use without restriction for any purpose and without accounting to Franchisee.

7.6    Business Operation.  Franchisee must open the franchised business within ninety days after completing the initial training program required by Section 7.1 above.  After opening, Franchisee shall maintain the franchised business in continuous operation during the term of this Agreement. Franchisee shall not use or permit the use of the Premises on which the franchised business is located for any other purpose or activity other than the operation of the franchised business, without first obtaining the written consent of Franchisor (provided, however, that this restriction shall not apply if Franchisee operates the franchised business from Franchisee's residence).  The franchised business must at all times be under the direct supervision of the Franchisee, or such person as has been approved in writing by Franchisor and has successfully completed Franchisor's training program, who (except as otherwise approved by Franchisor) must devote his full time and energy to the operation of the franchised business.

7.7    Taxes.    Franchisee shall pay all taxes on real and personal property, leasehold improvements and fixtures and equipment, and all sales, payroll and other taxes promptly when due and hold Franchisor harmless therefrom.  All taxes shall be paid directly to the taxing authorities prior to the delinquent date.  If any taxes become delinquent, Franchisor may elect to pay the delinquent tax on behalf of Franchisee, together with penalties and interest, if any, and Franchisee agrees, upon demand of Franchisor, to reimburse Franchisor for any sums so paid by Franchisor, together with interest at the rate of eighteen percent (18%) per annum, or the highest rate allowed by law, whichever is less, from the date of payment by Franchisor to the date of reimbursement by Franchisee.

7.8    Records.  During the term of this Agreement, Franchisee shall maintain and preserve, for at least six years from the date of their preparation, full, complete and accurate books and records of account, prepared in accordance with generally accepted accounting principles, and client files and records, all in the form and manner prescribed by Franchisor in the Manual or otherwise in writing. In connection with its maintenance of such accounts and records, Franchisee, at its expense, shall:

(a)    Submit to Franchisor, on or before the fifth (5th) day of each month during the term of this Agreement, a Revenue Report in the form prescribed by Franchisor, accurately reflecting all Gross Revenues during the preceding calendar month, and such other data or information as Franchisor may require;

(b)    Submit to Franchisor, within ninety days after the end of each calendar year during the term of this Agreement, an income statement for the preceding calendar year, reviewed by an independent public accountant, together with such other information as may be prescribed by Franchisor;

(c)    Submit to Franchisor an unaudited income statement for (i) January through March of a given calendar year on or before May 15 of that year; (ii) April through June on or before August 15; (iii) July through September on or before November 15; and (iv) October through December on or before February 15;

(d)    Submit to Franchisor signed copies of Franchisee's federal income tax return for the previous tax year, as filed with the Internal Revenue Service, on or before April 30 of each year, or within fifteen days after the final due date for such return if Franchisee has received a filing extension, but in no event later than November 15;

(e)    At Franchisor's request, agree to automate its system of reporting via the Internet or World Wide Web in lieu of monthly reporting;

(f)    Submit to Franchisor, for review or auditing, such other forms, reports, bank statements, client files, records, information, and data as Franchisor may reasonably designate, in the form and at such times and places as Franchisor may reasonably request;

(g)    Purchase and install such equipment as Franchisor may require to automate the reporting of financial information to be furnished by Franchisee pursuant to this Agreement; and

(h)    Permit Franchisor or its designated agents at all reasonable times to examine, at Franchisor's expense and at such location as Franchisor may reasonably select, Franchisee's books and records of account, bank statements, canceled checks, client files, state, federal and local income and payroll tax returns, and any other information or records pertaining to the franchised business (hereafter collectively referred to as Franchisee's "Business Records"). Franchisor's inspection of Franchisee's Business Records is primarily to determine any Royalty Deficiency that Franchisee may owe for the preceding calendar year and to determine any understated income by Franchisee.  If such an inspection should reveal that Gross Revenues (as defined in Section 5.4 hereof) have been understated in any report to Franchisor, then Franchisee shall immediately pay the amount of such understatement to Franchisor upon demand, plus the late fee and interest described in Section 5.3 hereof.  In addition, if an inspection discloses an understatement of Gross Revenues of 3% or more for any monthly period so inspected, Franchisee shall also reimburse Franchisor for any and all costs and expenses of such inspection (including, without limitation, wages paid by Franchisor to its employees, travel expenses, and

reasonable accounting and attorneys' fees). Franchisee, upon Franchisor's request, shall provide Franchisor the tax returns of Franchisee's principals if Franchisor reasonably suspects that Gross Revenues are understated. The foregoing remedies shall be in addition to any other remedies Franchisor may have. Franchisor shall also have the right, at any time, to have an independent audit made of Franchisee's Business Records.

7.9     <u>Indemnity and Insurance</u>.

(a)     Franchisee shall indemnify, hold harmless and defend Franchisor against and from all fines, proceedings, claims, demands or actions of any kind or nature and from anyone whomsoever arising out of or otherwise connected with Franchisee's operation of the franchised business (excluding, however, liabilities caused by (i) Franchisee's proper reliance on or use of procedures or materials provided by Franchisor or (ii) Franchisor's negligence).

(b)     Franchisee shall, prior to the opening of the franchised business and thereafter at all times during the entire term of this Agreement, at its own expense, keep in force by advance payment of premium:

(i)     All-Risk Insurance on all furniture, fixtures, equipment, supplies and other property used in the operation of the franchised business, for their full replacement cost;

(ii)     Commercial General Liability Insurance covering claims for bodily and personal injury, death, property damage, and contractual liability with a minimum per occurrence limit of $1,000,000 and a minimum general aggregate limit of $1,000,000;

(iii)     Automobile Liability Insurance for owned, hired, and non-owned vehicles with a minimum combined single limit of $1,000,000; and

(iv)     Worker's Compensation Insurance that complies with the statutory requirements of the state in which the franchised business is located and Employers' Liability Insurance with a minimum limit of $100,000 or, if greater, the statutory minimum limit if required by state law.

Franchisee shall maintain such other insurance as may be required by statute or rule of the state or locality in which the franchised business is located and operated. In addition, Franchisee shall carry such additional insurance as may be required by any lease to which Franchisee is a party and, if Franchisee provides consulting services, Errors and Omissions Coverage with a minimum per occurrence limit of $250,000 and a minimum general aggregate limit of $500,000. All policies of insurance that Franchisee is required to maintain hereunder shall contain a separate endorsement naming Franchisor as an additional insured, as its interest may appear, and no policy may have a deductible of more than $1,000. All insurance shall be placed with an insurance carrier or carriers approved in writing by Franchisor and shall not be subject to cancellation except upon thirty days written notice to Franchisor. Franchisee shall submit to Franchisor, prior to commencing business, certifications of insurance (with a copy of the original policy attached) and a workers' compensation certificate of premium payment, showing full compliance with the requirements of this paragraph, and shall keep current certifications on deposit with Franchisor at all times during the term of this Agreement. Franchisee shall not open or operate the franchised business until Franchisee has complied with all of the requirements of this paragraph. If Franchisee fails to comply with these requirements, Franchisor may (but shall not be obligated to) obtain the required insurance and keep it in force and effect, and Franchisee shall pay Franchisor, upon demand, the cost thereof, together with interest thereon at the rate of 18% per annum, or the highest rate allowed by law, whichever is less.

Franchisor, upon not less than thirty days written notice to Franchisee, may reasonably increase the minimum coverage for any insurance required hereunder, decrease the maximum deductible, or require different or additional kinds of insurance coverage to reflect inflation, changes in standards of liability, higher damage awards, or other relevant changes in circumstances.

7.10    <u>Non-Individual Franchisee</u>.  If Franchisee is an individual(s), he, she or they shall, within ninety (90) days after signing this Agreement, form a business entity (such as a corporation or limited liability company) for the purpose of operating the franchised business.  Such business entity shall comply with the requirements of subparagraphs (a) through (k) below.  If Franchisee is other than an individual, it shall comply with the requirements of subparagraphs (a) through (k) below prior to its execution of this Agreement:

(a)    Franchisee shall be newly organized and its charter, articles of organization, bylaws, or operating agreement shall provide that its activities are confined exclusively to operating the franchised business;

(b)    Franchisee, prior to the execution of this Agreement, shall have provided Franchisor with written information as to each shareholder, member or partner of Franchisee ("<u>Principals</u>") and the interest of each, on Exhibit A hereto, shall promptly notify Franchisor of any changes in any such information during the term of this Agreement and shall prescribe a maximum of ten Principals;

(c)    All Principals of Franchisee shall enter into an agreement, in a form satisfactory to Franchisor, unconditionally guaranteeing the full payment and performance of Franchisee's obligations to Franchisor;

(d)    Each ownership certificate of Franchisee shall have conspicuously endorsed upon its face the following legend:

"The transfer, sale or pledge of these shares is subject to the terms and conditions of a Franchise Agreement with G.C. Franchising Systems, Inc.";

(e)    Copies of Franchisee's articles of incorporation or organization, by-laws, partnership agreement, operating agreement, and other governing documents, including the resolutions of the Principals or Board of Directors authorizing the execution of this Agreement, shall be furnished to Franchisor for its approval; and

(f)    Franchisee's corporate or legal name (for example, as stated on the articles of incorporation, articles of organization, by-laws, operating agreement and/or other governing documents) shall not consist of or contain the Marks or any colorable variation thereof or any other mark in which Franchisor has or claims a proprietary interest. However, Franchisee shall use THE GROWTH COACH and its assigned franchise number as its assumed name (i.e. dba).

(g)    Franchisee shall not operate any other business or engage in any other business activities except the operation of one or more Growth Coach franchises.

(h)    Franchisee shall not cause or permit any provision of its organizational and governing documents to be modified or restated without Franchisor's prior written approval.

(i)     Within ten days after Franchisor's request or after any change in the Principals of Franchisee, Franchisee shall provide Franchisor with an updated list of Principals.

(j)     Upon request Franchisee shall provide Franchisor with copies, certified by a Principal, of Franchisee's organizational and governing documents.

(k)     Each new Principal must execute an agreement, in a form prescribed by Franchisor, to be jointly and severally bound by all the provisions of this Agreement, including the post-termination Provisions.

7.11    <u>Compliance with Law</u>.   Franchisee agrees to comply with all laws, regulations and requirements of federal, state, municipal, and other governmental entities and agencies (including, without limitation, Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act, state or local fictitious or assumed name registration requirements, and any federal, state or local employment laws), and to obtain and maintain any and all licenses and permits required by any governmental agencies or otherwise necessary to conduct the franchised business in any jurisdiction in which it operates.   Franchisee shall submit documented proof of its compliance with any local, state or federal law or licensing regulation within five (5) days of Franchisor's request, unless Franchisor authorizes in writing a longer period of time for Franchisee's compliance.  Franchisee agrees and acknowledges that Franchisee alone shall be responsible for compliance with the obligations under this paragraph, and that Franchisor shall have no obligation with respect to Franchisee's compliance under this paragraph.

7.12    <u>Client Dispute Resolution</u>.  Franchisee acknowledges that client satisfaction is essential to Franchisee's success as well as the reputation and success of the System and other Growth Coach franchisees.  Accordingly, Franchisee agrees to: (i) use its best efforts to ensure the satisfaction of each of Franchisee's clients; (ii) use good faith in all dealings with clients, potential clients, referral sources, suppliers and creditors; (iii) respond to client complaints in a courteous, prompt, and professional manner; (iv) use its best efforts to promptly and fairly resolve client disputes in a mutually-agreeable manner; and (v) within seven (7) days of receiving a request from Franchisor, provide Franchisor a written summary of the dispute.  If Franchisee fails to resolve a dispute with a client, for any reason whatsoever, Franchisor, in its sole discretion, may (but shall not be obligated to) investigate the matter and take such action as Franchisor may deem necessary or appropriate to resolve the dispute fairly and promptly, including, without limitation, the issuance of a refund on Franchisee's behalf.  Within ten days after receiving notice thereof, Franchisee shall reimburse Franchisor for any moneys refunded to a client on Franchisee's behalf.  Nothing contained in this Section or any other provision of this Agreement shall be construed to impose liability upon Franchisor to any third party for any action by or obligation of Franchisee.

7.13    <u>Communication and Information System</u>.   To ensure the efficient management and operation of the franchised business and the transmission of data to and from Franchisor, Franchisee, at its own expense, shall install, prior to opening the franchise business, and shall maintain and utilize during the term of this Agreement, such Communication and Information System as may be specified by the System Standards from time to time.

(a)     As used in this Agreement, the term "Communication and Information System" means:  hardware (including, without limitation, one or more computers and other computer components); software designed for the management and operation of the franchised business, as well as reporting and sharing information with Franchisor; and communication

systems (including, without limitation, digital and analog modems, satellite, cable, and other systems).

(b)     Franchisee shall lease or purchase its Communication and Information System only from a supplier that Franchisor has approved in writing pursuant to the provisions of Section 7.5 above.  Franchisee shall not install, or permit to be installed, any devices, software or other programs not approved by Franchisor for use with the Communication and Information System.

(c)     Franchisor may from time to time develop or authorize others to develop proprietary software programs for use in the System, which Franchisee may be required to purchase and/or license, and use, in connection with the franchised business.  Franchisee shall execute any license, sublicense, or maintenance agreement required by Franchisor or any other approved licensor or approved vendor of such proprietary software programs.

(d)     If required by Franchisor, Franchisee shall obtain and maintain a contract with a vendor that Franchisor has approved in writing for software maintenance, support, and upgrade services for Franchisee's Communication and Information System and to provide Franchisee with such assistance as Franchisee and Franchisee's employees may require. Franchisee acknowledges that Franchisor may be one of, or the only, approved vendor for such services, and if Franchisee obtains these services from Franchisor, then Franchisee agrees that it shall pay to Franchisor the maintenance fee and help desk fee specified by Franchisor for such services.  Notwithstanding these rights of Franchisor, Franchisor shall not at any time be obligated to provide any such services or support for the hardware or software used in the Communication and Information System.

(e)     Franchisee shall upgrade and update its Communication and Information System in the manner, and when, specified by Franchisor in writing, in accordance with Section 9.3 below.

(f)     Franchisee shall have the sole and complete responsibility for the manner in which Franchisee's Communication and Information System interfaces with other systems, including those of Franchisor and other third parties, as well as any and all consequences that may arise if Franchisee's Communication and Information System is not properly operated, maintained, and upgraded.

(g)     Franchisee shall:  (a) promptly enter, into its Communication and Information System, and maintain all information required to be entered and maintained by Franchisor; (b) provide to Franchisor such reports as Franchisor may reasonably request from the data so collected and maintained; and (c) permit Franchisor to access Franchisee's Communication and Information System at all times via modem or other means specified by Franchisor from time to time.  Franchisee shall cooperate with Franchisor, and shall execute all documents required by Franchisor to permit access to Franchisee's Communication and Information System and data contained therein.  The reporting requirements set forth in this Section shall be in addition to and not in lieu of the reporting requirements of Section 7.8 above.

(h)     Any and all data collected or provided by Franchisee, downloaded from Franchisee's Communication and Information System, and otherwise collected from Franchisee's system by Franchisor and/or provided to Franchisor is and shall be owned exclusively by Franchisor, and Franchisor shall have the right to use such data in any manner that Franchisor deems appropriate without compensation to Franchisee, including, but not

limited to, the disclosure or distribution of such information to other franchisees of Franchisor, or the disclosure of such information to prospective franchisees of Franchisor, by inclusion in Franchisor's franchise disclosure document or otherwise. Franchisee is hereby licensed (without any additional fee) to use such data solely for the purpose of operating the franchised business, and such license shall automatically and irrevocably expire when this Agreement terminates or expires, without additional notice. Franchisor shall reasonably protect confidential data and personally identifiable information of employees and clients of Franchisee. If Franchisor discloses financial data of Franchisee, Franchisor may not identify Franchisee or disclose any personally identifiable information of Franchisee in connection therewith without Franchisee's notification.

(i)      Franchisee shall maintain at least one dedicated telephone line for use exclusively by the franchised business. Each telephone line shall have service features as required by Franchisor in the Manual or otherwise communicated to Franchisee from time to time. Franchisor may require Franchisee to provide a full-time employee or answering service to answer Franchisee's telephone during regular business hours. All lines shall be operational and functional prior to opening the franchised business and thereafter at all times during the term of this Agreement. The main telephone number for the franchised business must be listed in a white-pages telephone directory under the business name specified by Franchisor and a location within Franchisee's Territory. Franchisor has the right, but is not obligated, to provide a telephone number for Franchisee's use and Franchisee shall reimburse Franchisor for the cost thereof or shall pay the service provider directly, at Franchisor's option. If Franchisor provides a telephone number for Franchisee's use, Franchisee shall use only the number provided by Franchisor for the franchised business, including Franchisee's stationery, advertisements, marketing materials, directory listings (including online directories), and electronic distribution channels.

(j)      Prior to opening the franchised business and thereafter at all times during the term of this Agreement, Franchisee shall obtain and maintain a standard e-mail account that is capable of receiving and sending attached files of a size specified by Franchisor in the Manual or otherwise communicated to Franchisee from time-to-time, along with a high speed cable or telephone (ADSL) Internet connection via a commercial Internet service provider.

(k)      Franchisor shall have the right, but not the obligation, to establish a Web site (as defined in Section 11.8 below) or other electronic system providing private and secure communications (*e.g.*, an intranet) between Franchisor, Franchisee, other franchisees, and other persons and entities as determined by Franchisor, in its sole discretion. If required by Franchisor, Franchisee shall establish and maintain access to the intranet in the manner specified by Franchisor, and shall from time to time execute such agreements and/or acknowledge and agree to comply with such policies concerning the use of the intranet as Franchisor may prepare.

(l)      Any and all data collected or provided by Franchisee, downloaded from Franchisee's Communication and Information System, or otherwise collected from Franchisee by Franchisor or provided to Franchisor, is and will be owned exclusively by Franchisor, who has the right to use the data in any manner without compensation to Franchisee. Franchisee is hereby licensed, without additional compensation, to use such data solely for the purpose of operating the franchised business. This license will automatically and irrevocably expire, without additional notice or action by Franchisor, when this agreement terminates or expires.

(m)      Franchisee shall abide by all applicable laws pertaining to privacy of information collected or maintained regarding clients or other individuals ("Privacy"), and comply with Franchisor's standards and policies pertaining to Privacy. If there is a conflict between applicable law and Franchisor's Privacy standards and policies, Franchisee shall: (i) comply with the requirements of applicable law; (ii) immediately provide Franchisor with written notice of the conflict; and (iii) promptly and fully cooperate with Franchisor and Franchisor's counsel as Franchisor determines the most effective way, if any, to reconcile Franchisor's Privacy standards and policies with applicable law. Franchisee is solely responsible for identifying, interpreting and complying with all laws pertaining to Privacy. Franchisee shall neither publish nor implement a Privacy policy without Franchisor's prior written approval of the policy.

7.14   Compliance with USA Patriot Act. Franchisee certifies that neither Franchisee nor any of its affiliates, principals, or employees is listed in the Annex to Executive Order 13224 ("the Annex," which may available on-line at http://www.treasury.gov/resource-center/sanctions/Programs/Documents/terror.pdf.) Franchisee shall not hire or have any dealings with a person listed in the Annex. Franchisee certifies that it has no knowledge or information that, if generally known, would result in Franchisee or any of its affiliates, principals, or employees being listed in the Annex. Franchisee shall comply with and/or assist Franchisor to the fullest extent possible in Franchisor's efforts to comply with the anti-terrorism laws. In connection with such compliance, Franchisee certifies, represents, and warrants that none of its property or interests is subject to being "blocked" under any of the Anti-Terrorism Laws and that Franchisee and its affiliates and principals are not otherwise in violation of any of the Anti-Terrorism Laws. Franchisee is solely responsible for ascertaining what actions must be taken by Franchisee to comply with all Anti-Terrorism Laws, and Franchisee specifically acknowledges and agrees that its indemnification responsibilities include Franchisee's obligations under this paragraph. Any misrepresentation by Franchisee under this paragraph or any violation of the Anti-Terrorism Laws by Franchisee, its affiliates, principals, or employees, will constitute grounds for immediate termination of this agreement.

7.15   System Evaluations.   Franchisee shall participate in and fully comply with all client satisfaction programs Franchisor may establish from time-to-time, including the requirements to advertise and make known and available to clients all such programs and to honor the terms of all such programs. Franchisee is subject to and may be required to participate in any evaluation of standards or quality that Franchisor may conduct or sanction for all Growth Coach franchises. Franchisee shall provide Franchisor and Franchisor's designees with access to Franchisee's books, records, files, employees, and independent contractors for this purpose.

7.16   Disclosure of Franchisee Information. Franchisee acknowledges that Franchisor may from time-to-time be required or find it necessary to disclose to third parties certain information about Franchisee and Franchisee's Principals, including contact information such as names, addresses and telephone numbers, and other information collected by Franchisor under this agreement. Franchisee hereby consents to Franchisor's collection, use, and disclosure of any information pertaining to the Franchised Business (including contact information of Franchisee and Franchisee's Principals) for Franchisor's reasonable business purposes and for any purpose described in Franchisor's privacy policy (as may be amended from time-to-time), subject to the limitations of this paragraph. Without limiting the generality of the foregoing sentence, Franchisee hereby consents to (i) the collection, use and disclosure of any information about Franchisee and Franchisee's Principals (including contact information) to develop, modify and enhance the System, to conduct credit checks or other personal history investigations, to develop general franchisee profiles, to comply with applicable Franchise Laws, and to otherwise comply with any applicable law; (ii) the transfer of any information (including contact information) to any third party in order for

Franchisor to fulfill its obligations under this agreement or attempt to obtain any benefit for Franchisor, Franchisee or the System as a whole; and (iii) the release to Franchisee's landlord, lenders or prospective landlords or lenders, of any financial or operational information relating to Franchisee and/or the Franchised Business (without obligating Franchisor to do so). Franchisor shall protect confidential data and contact information of Franchisee's employees and clients. If Franchisor discloses financial information of Franchisee in a franchise disclosure document, Franchisor shall not identify Franchisee or disclose any contact information of Franchisee in connection with the financial information without Franchisee's prior consent. "Contact Information" is any information about a person that can be used to uniquely identify, contact, or locate the person.

7.17   Operational Inspections by Franchisor. To provide assistance and guidance with respect to the operation and management of the Franchised Business, ensure quality standards and consistency within the System, and ensure that Franchisee is complying with this agreement and the System Standards, Franchisor or Franchisor's agents have the right, but not the obligation, at any time during business hours and without prior notice to Franchisee, to conduct field visits to: (1) inspect the Franchise Premises, equipment, furniture, fixtures, displays, signs, operating materials, inventory, and supplies; (2) observe the operations of the Franchised Business at the Premises and on-site with clients, for such consecutive or intermittent periods as Franchisor deems necessary; (3) photograph or video record the Premises and Franchisee's clients and personnel; (4) interview Franchisee's personnel; (5) interview Franchisee's clients; (6) conduct written or telephonic surveys of Franchisee's clients or referral sources; (7) conduct an inspection described in section 7.8(g); and (8) inspect and copy any books, records and documents relating to the operation of the Franchised Business, including employment contracts, nondisclosure and noncompetition agreements, leases, and material and information generated by or contained in the Communication and Information System. Franchisee shall cooperate fully with Franchisor in connection with each field visit and any inspection, observation, survey and interview in connection therewith. Franchisee shall present its clients with any evaluation forms Franchisor may periodically prescribe and ask them to participate in any surveys conducted by Franchisor on Franchisee's behalf. If Franchisee for any reason cancels a visit that was scheduled by agreement with Franchisee, then Franchisee shall reimburse Franchisor for all costs and expenses incurred by Franchisor in connection with the field visit or its cancellation.

7.18   Covenants of Employees and Agents. Franchisee shall require each of its management employees (except those individuals required to execute a Restrictive Covenant Agreement pursuant to section 15.9), at the time of the commencement of their association with Franchisee, to execute an "Employment Agreement" containing provisions:

  (a)   requiring that all Confidential Information (as defined in section 10.1) that may be acquired by or imparted to the person in connection with their association with Franchisee (including the Manual, any proprietary software provided by Franchisor, and all information contained therein) be held in strict confidence and used solely for the benefit of Franchisee or Franchisor during their association with Franchisee and at all times thereafter;

  (b)   prohibiting the person, during their association with Franchisee, from diverting or attempting to divert any business or customer of the Franchised Business or of any other Growth Coach franchisee to any competitor of the franchised business, by direct or indirect inducement or otherwise;

  (c)   prohibiting the person, during their association with Franchisee, from doing or performing, directly or indirectly, any act injurious or prejudicial to the goodwill associated with the Marks and the System;

(d)      prohibiting the person, during their association with Franchisee, from employing or seeking to employ any person who is at that time employed by Franchisor, Franchisee, or any other Growth Coach Franchisee, or otherwise directly or indirectly inducing or attempting to induce such person to leave his or her employment; and

(e)      prohibiting the person, during their association with Franchisee and for a continuous period of one year (or the maximum period permitted or enforced by the laws of the state in which the Franchised Business is located, if such period is less than one year, but in no event less than six months) after the termination of their association with Franchisee, from operating, owning, maintaining, promoting, engaging in, or performing services for (as an employee or otherwise) any competitor of the franchised business.

Franchisee shall provide Franchisor with executed copies of all Employment Agreements required by this section.  Franchisee may not grant any person enumerated above access to any confidential aspect of the System or the Franchised Business before their execution of an Employment Agreement.  All Employment Agreements required by this section must be in a form satisfactory to Franchisor and must specifically identify Franchisor as a third-party beneficiary with the independent right to enforce the agreement.  Franchisee's failure to obtain the execution of all Employment Agreements required by this section and provide copies thereof to Franchisor is a material breach of this agreement.

7.19   <u>Attendance at Franchisee Meetings and Conventions</u>.  Franchisor may, but is not obligated to, hold national and/or regional meetings with Franchisor's personnel and Growth Coach franchisees at locations designated by Franchisor, to provide additional training, exchange sales, operating and marketing ideas and methods, introduce new software, marketing programs, or promotional items, and for any other purpose determined by Franchisor.  Franchisor has the right to require Franchisee or the Designated Individual (if Franchisee is not an individual) to attend these national and/or regional meetings.  Franchisor has the right to charge Franchisee a reasonable fee for such meetings.  Nothing in this agreement is to be construed to require Franchisor to hold, provide, sponsor, host, or organize any such meetings.

## ARTICLE 8

## PROPRIETARY MARKS

8.1   <u>Use by Franchisee</u>.  Franchisee's rights to use the Marks as granted in Section 1 herein is limited to their use in connection with the operation of the franchised business within the Territory described in Section 1.2 hereof, and otherwise as described herein and as set forth in the Manual or as may be prescribed in writing by Franchisor from time to time.  Franchisee shall operate the franchised business under the assumed name (i.e. dba) THE GROWTH COACH and its assigned franchise number, and shall not use any other assumed name or trade name in connection with the franchised business.

8.2   <u>Exclusive Property of Franchisor</u>.  Franchisee acknowledges Franchisor's right, title and interest in and to the Marks, along with the identification, schemes, standards, specifications, operating procedures, and other concepts embodied in the System.  Franchisee is a "related company" within the meaning of 15 U.S.C. § 1127 and Franchisee's use of the Marks pursuant to this Agreement inures to the benefit of Franchisor.  Except as expressly provided by this Agreement, Franchisee shall acquire no right, title or interest therein, and any and all goodwill associated with the system and the Marks shall inure exclusively to Franchisor's benefit.  Upon the expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the system or the Marks.

8.3     Infringement by Franchisee.  Franchisee acknowledges that the use of the Marks outside of the scope of this Agreement without Franchisor's prior written consent is an infringement of Franchisor's rights, title and interest in and to the Marks.  Franchisee expressly covenants that during the term of this Agreement and after the expiration or termination hereof, Franchisee shall not, directly or indirectly, commit an act of infringement or contest, or aid in contesting, the validity or ownership of the Marks or take any other action in derogation thereof.

8.4     Infringement by Others.  Franchisee shall promptly notify Franchisor of any use of the Marks or any colorable variation thereof by any person or legal entity other than Franchisor or any of its representatives and agents or other franchisees, or any other mark in which Franchisor has or claims a proprietary interest.  Franchisee further agrees to notify Franchisor promptly of any litigation instituted by any person or legal entity against Franchisor or Franchisee involving the Marks.  In the event Franchisor, in its sole discretion, undertakes the defense, prosecution, or settlement of any litigation relating to the Marks, Franchisee agrees to execute any and all documents, and to render such assistance as may, in the opinion of Franchisor, be reasonably necessary to carry out such defense, prosecution or settlement.  Franchisee acknowledges that the nature of trademark law makes it impossible for Franchisor to guarantee or warrant the exclusivity of Franchisor's right to use any of the Marks, and that nothing in this Agreement or in any other document or promotional material provided by Franchisor to Franchisee or to any other party may be construed to guarantee, warrant, or imply that Franchisor's right to use any of the Marks is exclusive or superior to the rights of any other party.  In the event that any party demonstrates, to Franchisor's sole satisfaction, a superior right to use any of the Marks, Franchisee shall, upon demand by Franchisor, discontinue its use of such Marks and adopt, at Franchisee's sole cost and expense, any replacement marks, if any, selected by Franchisor, and Franchisor shall have no liability to Franchisee therefor.

8.5     Improper Use.  Franchisee shall not use any of the Marks, or any derivative or colorable variation thereof:  (i) as part of Franchisee's corporate or other legal name; (ii) on or as part of any Web site, domain name, URL, Web page, electronic mail address, listing, banner, advertisement or any other service or link on, to or with the Internet, World Wide Web, Internet service providers, electronic mail services, communication providers, search engines, or other similar services without prior written approval; (iii) with any modifying or additional words, terms, designs, or symbols (including, without limitation, the word "Inc.") other than those specifically authorized by Franchisor; or (iv) in any modified form.  Franchisee shall not register any of the Marks, or any derivative or colorable variation thereof, as a service mark, trademark, or Internet domain name, or hold out or otherwise employ the Marks to perform any activity or to incur any obligation or indebtedness in such a manner as could reasonably result in making Franchisor liable therefor or that may harm, tarnish, or impair Franchisor's reputation, name, services or Marks.  If Franchisor provides Franchisee with any contracts, agreements, forms, or other documents that contain any of the Marks, Franchisee shall not alter or modify such contracts, agreements, forms, or documents without Franchisor's prior written consent.

8.6     Non-exclusive Use.  Franchisee expressly acknowledges and agrees that this license to use the Marks is non-exclusive, and Franchisor has and retains the rights, among others:

        (a)     To grant other licenses for the use of the Marks, in addition to those already granted to existing franchisees and to Franchisee;

        (b)     To develop and establish other systems and programs utilizing the same or similar Marks, or any other proprietary marks, and to grant franchises therein without granting Franchisee any rights therein; and

(c)      To identify clients or potential clients as National Accounts, to service National Accounts, and to award the right to service National Accounts to any franchisee of the System, in Franchisor's sole and absolute discretion.

*provided, however*, that Franchisor shall not, within Franchisee's Territory, except as otherwise permitted in Article 1 of this Agreement, (i) grant other licenses to use the Marks or (ii) establish, or franchise another to establish, a business substantially similar to the franchised business.

8.7      Use by Others.  Franchisee shall not permit any third party to imprint the Marks on any products, materials, documents and supplies utilized by Franchisee in connection with the operation of the franchised business without first obtaining the prior written consent of Franchisor and requiring such party to execute a license agreement as specifically described in Section 6.2 herein.

8.8      Improvements Developed by Franchisee.  If Franchisee or any of its Principals, affiliates, directors, officers, or employees conceives, develops, or acquires any improvements or additions to the System or the services or products offered by or the method of operation of a Growth Coach Franchise, or any advertising or promotion ideas related to a Growth Coach Franchise or the franchised business (collectively, "Improvements"), Franchisee shall, in each instance, promptly and fully disclose the Improvement to Franchisor without disclosure of the Improvement to others, and obtain Franchisor's written approval before using the Improvement. Any Improvement may be used by Franchisor and Growth Coach franchisees without any obligation to Franchisee or its Principals, affiliates, directors, officers, or employees for royalties, licensing fees, or other compensation. Franchisee shall assign to Franchisor or Franchisor's designee(s), without charge, all rights, including the right to grant sublicenses, to all Improvements.  If for any reason Franchisee and not Franchisor is deemed to own any right to an Improvement, then this agreement will operate as an agreement to irrevocably transfer and assign all rights in and to the Improvement. Franchisee shall take no steps to appropriate any Improvement for itself. Franchisee shall, at Franchisor's request, execute all assignments, certificates or other instruments (and, if necessary, require its Principals, affiliates, directors, officers, employees and independent contractors to execute such documents as well) as Franchisor may from time-to-time deem necessary or desirable to evidence, establish, maintain, perfect, protect, enforce or defend Franchisor's rights, title or interest in or to any Improvement or to otherwise carry out the provisions of this paragraph.  In return, Franchisor shall authorize Franchisee to use any Improvement developed by Franchisor or another Growth Coach franchisee that Franchisor makes part of the System. As used in this paragraph, the term "Improvements" includes intellectual property and all advertising, marketing, promotional, public relations or sales concepts, plans, programs, techniques, activities, materials, or Web sites proposed or developed by Franchisee for the franchised business, whether or not they bear the Marks.

## ARTICLE 9

## CONFIDENTIAL MANUAL

9.1      Business Operations.  In order to protect the reputation and goodwill of Franchisor and to maintain uniform standards of operation under the Marks, Franchisee shall conduct its operations hereunder in accordance with Franchisor's Manual (as the same may be amended or modified from time to time), which Franchisee acknowledges having received on loan from Franchisor.

9.2      Confidentiality.  The Manual shall at all times remain the sole property of Franchisor. Franchisor treats as confidential and proprietary the Manual and all information contained therein. Franchisee shall treat the Manual and all the information contained therein as confidential, and shall use all reasonable efforts to maintain such information as secret and confidential.  Franchisee shall

also ensure that its employees treat as confidential and proprietary the Manual and all information contained therein. Franchisee shall not at any time, without Franchisor's prior written consent, copy, duplicate, record, or otherwise make the same available to any unauthorized person.

9.3    Modification. Franchisor shall have the right to add to or otherwise modify the Manual from time to time to reflect changes in any of the System Standards, provided that no such addition or modification shall alter the Franchisee's fundamental status and rights under this Agreement. Without limiting the generality of the foregoing, Franchisor may, during the term of this Agreement, require Franchisee to modify, enhance and/or replace all or any part of Franchisee's Communication and Information System at Franchisee's expense, and Franchisee agrees to acquire (or acquire the right to use for the remainder of the term of this Agreement), within 30 days after receipt of written notice from Franchisor, the modified, enhanced or replacement version of the Communication and Information System specified by Franchisor. Franchisee further agrees to take all other actions as may be necessary to enable the modified, enhanced or replacement Communication and Information System to operate as specified by Franchisor.    Any such modifications, enhancements and replacements may require Franchisee to incur costs to purchase, lease, and/or license new or modified computer hardware and/or software or other equipment and to obtain different and/or additional service and support services during the term of this Agreement. Franchisee acknowledges that Franchisor cannot estimate the costs of future maintenance, enhancements, modifications, and replacements to the Communication and Information System or other items, and that such maintenance, enhancements, modifications, and replacements required by Franchisor may involve additional investment by Franchisee during the term of this Agreement. Franchisee shall at all times insure that its copy of the Manual is kept secure, current, and up to date, and in the event of any dispute as to the contents of the Manual, the terms of the master copy of the Manual maintained by Franchisor at the Franchisor's home office shall be controlling.  Upon Franchisor's request, Franchisee will cooperate in the efficient return of all Manuals that have been identified by the Franchisor as obsolete.

## ARTICLE 10

## CONFIDENTIAL OR PROPRIETARY INFORMATION

10.1    Use of Confidential Information. Franchisee shall not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person, persons, partnership, association or corporation, any confidential information, knowledge, or know-how concerning the franchised business, the System, or methods of operation that may be communicated to Franchisee, or of which Franchisee may be apprised, by virtue of Franchisee's business operations under the terms of this Agreement ("confidential information"). "Confidential information" includes the identities and personal and contact information of customers of the franchised business, financial statements, results of operations, sales, income, expense, and other financial information and records of the franchised business operated by Franchisee.    Franchisee shall divulge confidential information only to such of its employees, agents, or professional advisors as must have access to it in order to operate the franchised business as described herein, or with Franchisor's prior written consent. In connection therewith, Franchisee shall be fully responsible for ensuring that its employees, agents and professional advisors comply with this Section.

10.2    Remedies. Franchisee acknowledges that any failure to comply with Section 10.1 of this Agreement will cause Franchisor irreparable injury, and Franchisee consents to the issuance of, and agrees to pay all court costs and reasonable attorneys' fees incurred by Franchisor in obtaining, specific performance of, or any injunction against a violation of, the requirements of Section 10.1.

10.3   Preservation of Confidentiality.   Franchisee shall require Franchisee's directors, officers, management employees, and holders of a direct or indirect ownership interest in Franchisee, at the time of the commencement of their association with Franchisee, to execute confidentiality agreements, in a form approved by Franchisor, requiring that all information being proprietary or confidential hereunder that may be acquired by or imparted to such persons in connection with their association with Franchisee be held in strict confidence and used solely for the benefit of Franchisee and Franchisor, at all times during their association with Franchisee and thereafter. Franchisee shall require each prospective purchaser of the franchised business, the license granted under this agreement, or any interest in Franchisee, prior to disclosing any confidential information to such person, to execute a confidentiality agreement, in a form approved by Franchisor, requiring that all proprietary or confidential information that may be disclosed to such person in connection with his or her investigation of Franchisee or the franchised business, will be held in strict confidence and used solely to evaluate the contemplated transaction.   All confidentiality agreements described in this paragraph must include a specific identification of Franchisor as a third-party beneficiary of such covenants with the independent right to enforce the agreement.

10.4   Copyright to Material Developed by Franchisee.   All instructional materials, concepts, plans, programs, activities and other materials proposed or developed by Franchisee for the provision of Permitted Products and Services must be approved by Franchisor, and may be used by Franchisor and other Franchises without any compensation to Franchisee.   Any and all copyrights in and to such materials that are proposed or developed by or on behalf of Franchisee will be the sole property of Franchisor, without compensation to Franchisee, and Franchisee shall execute such documents (and, if necessary, require its independent contractors to execute such documents) as may be deemed reasonably necessary by Franchisor to give effect to this provision.

10.5   Ownership of Confidential Information.   Franchisee agrees that Franchisor owns and controls all domain names and URLs ("Uniform Resource Locator") relating to any Franchise, as well as all Confidential Information, electronic information, lists, and data related to past, present and future clients of any Franchise.   Franchisee's only interest in any of this proprietary and/or Confidential Information is the right to use it pursuant to this Agreement.

10.6   Client List.   Acting as Franchisor's agent and on its behalf, Franchisee shall prepare a Client List containing all information that Franchisor may specify so that ownership of the Client List and the information in it belongs to Franchisor.   Franchisee will acquire no proprietary or ownership rights to its Client List or to service any of its clients other than the rights specifically granted under this agreement.   Franchisee is permitted to use the Client List for the purposes of this agreement but for no other purpose.   Without limiting the generality of the preceding sentence, Franchisee shall not disclose or transfer its Client List to any person except to Franchisor or as part of a Transfer that complies with Article 12.   The Client List is considered Confidential Information and Franchisee shall treat it as such at all times.   Franchisee shall provide Franchisor, not more frequently than monthly, with a current Client List in the format and by the means specified by Franchisor from time-to-time.   Upon the expiration or termination of this agreement for any reason, Franchisor may notify Franchisee's clients thereof and, without compensation to Franchisee, authorize one or more other Growth Coach franchisees or any other person to provide Authorized Products and Services to Franchisee's former clients.

## ARTICLE 11

## ADVERTISING

11.1   National Branding Fee.   As required in Section 5.2 hereof, Franchisee shall pay a National Branding Fee to such national branding fund (the "Fund") as Franchisor may establish.   Franchisor

shall, for each of its company-owned locations (if any), pay National Branding Fees on the same basis as other franchisees within the System.

11.2    <u>National Branding Funds</u>.  Franchisor has the right, in its discretion, to establish one or more national or regional Funds and to designate any geographical area as a region for establishing regional advertising Funds.  Franchisor shall maintain and administer the Funds as follows:

(a)    The Funds are intended to maximize general public recognition and acceptance of the Marks for the benefit of all Franchises within the System or within a region, as the case may be, and that Franchisor is not obligated in administering the Funds to make expenditures for Franchisee which are equivalent or proportionate to Franchisee's contribution or to ensure that any particular Franchisee benefits directly or <u>pro rata</u> from the placement of advertising.

(b)    The Funds, all contributions thereto, and any earnings thereon, shall be used exclusively to meet any and all costs of maintaining, administering, researching, directing, and preparing advertising and/or promotional activities, developing new public relations campaigns and new advertising, promotional and marketing materials for the System and for franchisees in the System, and the solicitation of National Accounts.

(c)    Franchisor shall, for each of its company-owned locations (if any), make contributions to the Funds on the same basis as assessments required of comparable franchisees within the System.

(d)    Franchisee shall contribute to the Funds by separate check made payable to the Growth Coach National Branding Fund or such other designation as Franchisor may from time to time prescribe.  All sums paid by Franchisee to the Funds shall be maintained in an account separate from the other moneys of Franchisor.  Such sums shall not be used to defray any of Franchisor's operating expenses, except for such reasonable salaries, overhead, and administrative, accounting, legal (including, without limitation, the defense of any claims against Franchisor and/or Franchisor's designee regarding the management of the Funds) and other costs, if any, as Franchisor may incur in activities reasonably related to the administration or direction of the Funds or advertising programs for franchisees and the System, including the costs of enforcing contributions to the Funds required under this Agreement and the costs of preparing a statement of operations.  The Funds and their earnings shall not otherwise inure to the benefit of Franchisor.  Franchisor shall maintain separate bookkeeping accounts for each Fund.

(e)    It is anticipated that all contributions to and earnings of the Funds shall be expended for advertising and/or promotional purposes during the taxable year within which the contributions are made.  If, however, excess amounts remain in the Funds at the end of such taxable year, all expenditures in the following taxable year(s) shall be made first out of accumulated earnings from previous years, next out of earnings in the current year, and finally from contributions.

(f)    Franchisee agrees that Franchisor (and any designee of Franchisor) shall not have any direct or indirect liability or obligation to Franchisee, the Funds or otherwise with respect to the management, maintenance, direction, administration or otherwise of the Funds.  Franchisee further agrees that Franchisor shall not be liable for any act or omission, whether with respect to the funds or otherwise, which is consistent

with this Agreement or other information provided to you, or which is done in subjective good faith. Franchisee and Franchisor, each having a mutual interest and agreeing on the critical practical business importance of their relationship being governed solely by written instruments signed by the parties to be bound (and not having either party subject to the uncertainty inherent in the application of legal or other concepts not expressly agreed to in writing by both parties), agree that their rights and obligations with respect to the Funds and all related matters are governed solely by this Agreement and that neither this Agreement nor the Funds are in the nature of a "trust," "fiduciary relationship" or similar special arrangement, but is only an ordinary commercial relationship between independent businesspersons for their independent economic benefit.

11.3 <u>Separate Asset</u>. The Funds are not and shall not be an asset of Franchisor.

11.4 <u>Termination of Funds</u>. Although Franchisor intends the Funds to be of perpetual duration, Franchisor maintains the right to terminate any Fund. No Fund shall be terminated, however, until all moneys in the Fund have been expended for advertising and/or promotional purposes or returned to contributors on the basis of their respective contributions during the one-year period immediately preceding the termination.

11.5 <u>Advertising Materials</u>. In addition to the requirements described in Section 11.1 hereof, Franchisee shall obtain and maintain an adequate supply of brochures, pamphlets, and special promotional materials of such kind and size as Franchisor may reasonably require from time to time in the Manual or otherwise in writing. Franchisee acknowledges that it shall be solely responsible for advertising and marketing the services offered by the franchised business.

11.6 <u>Delegation of Franchisor's Duties</u>. Franchisor shall have the right to delegate and redelegate its responsibilities and duties under this Article 11 to any designee(s) of its choosing; provided, however, that the right of final approval of all advertising programs shall be retained at all times by Franchisor.

11.7 <u>Approval of Advertising</u>. All advertising by Franchisee in any medium shall be conducted in a dignified manner, shall be completely accurate and truthful, shall conform to all applicable laws and regulations relating to consumer advertising and to such standards and requirements as Franchisor may specify from time to time in writing, and shall give notice that the franchised business is independently owned and operated. Franchisee shall submit to Franchisor (by certified mail, return receipt requested), for Franchisor's prior approval (except with respect to prices to be charged), samples of all advertising and promotional plans and materials, including signs, and all other materials displaying the Marks that Franchisee desires to use and that have not been prepared or previously approved by Franchisor. Unless Franchisee receives a written notice of disapproval within thirty days after Franchisor's receipt thereof, Franchisor shall be deemed to have given the required approval, excluding Franchisee's use of a Web site, which is subject to Franchisor's prior written approval. Franchisee shall display the Marks in the manner prescribed by Franchisor on all signs and all other advertising and promotional materials used in connection with the franchised business. Franchisee specifically acknowledges and agrees that the word "<u>advertising</u>" as used in this Article 11 includes, without limitation, signs (including signs on motor vehicles), URLs, e-mail addresses, Internet listings, banners, advertisements, or other services or links on or with the Internet, World Wide Web, Internet service providers, electronic mail services, communication providers, search engines, and similar services.

11.8 <u>Web site</u>. Franchisee specifically acknowledges and agrees that any Web site or blog (as defined below) will be deemed "<u>advertising</u>" under this Agreement, and will be subject to the terms

of Article 11.7 except that Franchisor must give prior written approval of the Web site prior to use by Franchisee. As used in this Agreement, the terms "Web site" and "blog" mean an interactive electronic document, series of symbols, or otherwise, that is contained in a network of computers and/or other devices linked by communications software. The term Web site includes, but is not limited to, Internet and World Wide Web home pages, social media pages, and web logs. In connection with any Web site, Franchisee agrees to the following:

(a)     Franchisor has the right, but not the obligation, to establish and maintain a Web site, which may, without limitation, promote the Marks, any or all of the Permitted Products and Services, Growth Coach franchisees, the offer of Growth Coach franchises, and/or the System. Franchisee shall use all Web sites relating to the franchised business required by Franchisor. Franchisor shall have the sole right to control all aspects of the Web site, including, but not limited to, its design, content, functionality, links to the Web sites of third parties, legal notices, and policies and terms of usage. Franchisor shall also have the right to discontinue the operation of the Web site at any time in its business judgment.

(b)     Franchisee shall not directly or indirectly establish, maintain, or operate a separate Growth Coach Web site without Franchisor's prior written consent. Any Growth Coach Web site established, maintained, or operated by Franchisee must contain a link to and from Franchisor's Web site and Franchisor has the right to require modifications of the content, appearance, and format of Franchisee's Growth Coach Web site. The term "Growth Coach Web site" means a Web site that displays any of the Marks or a significant amount of the content of which relates to the franchised business, franchisor, the System, or any business that offers or sells products or services that compete with any products or services offered by Growth Coach franchises.

(c)     Franchisee shall not, without Franchisor's prior written consent, establish or permit or aid any other person to establish any link to any Web site or any other electronic or computer-generated advertising or communication arrangement that Franchisor may establish.

(d)     Franchisor shall have the right, but not the obligation, to designate one or more Web page(s) to describe Franchisee and/or the franchised business, with such Web page(s) to be located within Franchisor's Web site, or to provide Franchisee with a separate Growth Coach Web site or pages for such purposes. Franchisee shall comply with Franchisor's policies with respect to the creation, maintenance, and content of any such Web pages, and Franchisor shall have the right to limit and/or discontinue the content and/or operation of such Web site and Web pages.

(e)     In order to maintain the goodwill in the System and in the business of Franchisor and Franchisor's licensees, Franchisor has the right to impose conditions and standards requirements on Franchisee's use of electronic distribution channels, including any Growth Coach Web site maintained by Franchisee, including the following:

(i)     Franchisor is to own all rights to all domain names containing any of the Marks or relating to the franchised business, any Permitted Products and Services, or any business that offers or sells products or services that compete with any products or services offered by Growth Coach franchises. Franchisee shall not register in its own name any domain name containing any of the Marks or relating to the franchised business, any Permitted Products and Services, or

any business that offers or sells products or services that compete with any products or services offered by Growth Coach franchises.

(ii)    In order to maintain the common identity of the System and the high quality standards associated with the System, Franchisee shall obtain Franchisor's prior written approval for any domain name and for the form and content of any Growth Coach Web site before Franchisee uses it on the Internet. Unless Franchisor's prior written approval has been obtained, no element of the Marks or similar words may be used as part of the domain name or URL.

(iii)    Any Growth Coach Web site established or maintained by Franchisee must contain a hyperlink to Franchisor's Web site and all other hyperlinks to third-party Web sites must be previously approved in writing by Franchisor.

(iv)    Any modifications to a Growth Coach Web site established or maintained by Franchisee must first be approved in writing by Franchisor.

(v)    Before establishing a Growth Coach Web site, Franchisee shall obtain appropriate legal advice regarding the content and to ensure that the Web site complies with all relevant legislation and regulations.

(vi)    Franchisee shall fully indemnify Franchisor against all and any claims arising out of any Web site established or maintained by Franchisee.

(vii)    Franchisee shall comply fully with its terms and conditions of business over the Internet and shall ensure that such terms and conditions of business receive Franchisor's prior written approval.

(f) Franchisee shall not participate in or register with any Internet group, Web site or similar medium which has as its aim (whether stated or not) or its effect the denigration of Franchisor the System.

(g) Franchisee shall not open an account or profile on a social media site relating to the franchised business or using any of the Marks without Franchisor's prior written consent, which may be given subject to conditions, which may include the grant to Franchisor of administrator rights, and subject to Franchisee's compliance with the provisions of the Manuals relating to social media sites.

(h) Franchisee shall not, without Franchisor's prior written consent, redirect Internet traffic from another domain name or URL to any Growth Coach Web site established by Franchisee or any other Web site containing any of the Marks or any content provided by Franchisor or relating to the franchised business.

(i)    Franchisor shall have the right to modify the provisions of this Section 11.8 as Franchisor shall solely determine is necessary or appropriate for the best interests of the System.

11.9   <u>Copyright to Advertising</u>. Franchisee acknowledges and agrees that any and all copyrights in and to advertising and promotional materials developed by or on behalf of Franchisee which bear the Marks shall be the sole property of Franchisor, and Franchisee agrees to execute such documents (and, if necessary, require its independent contractors to execute such documents) as may be deemed reasonably necessary by Franchisor to give effect to this provision. Any advertising, marketing, promotional, public relations, or sales concepts, plans, programs, activities,

or materials proposed or developed by Franchisee for the franchised business or the System and approved by Franchisor may be used by Franchisor and other franchisees of Franchisor without any compensation to Franchisee.

11.10 <u>Advertising Cooperative</u>. Franchisor may, in its discretion, designate any geographical area in which at least two Growth Coach franchises are located for the purpose of establishing a local or regional marketing and advertising cooperative ("<u>Cooperative</u>"). Franchisee shall take appropriate steps to establish and participate in a Cooperative if required to do so by Franchisor. If a Cooperative for the geographical area in which the franchised business is located has already been established when Franchisee opens the franchised business, then Franchisee shall immediately become a member of the Cooperative under the terms of its governing documents. If a Cooperative for the geographical area in which the franchised business is located is established during the term of this agreement, Franchisee shall immediately become a member of the Cooperative, and take all steps necessary to become a member. In no event shall Franchisee be required to be a member of more than one Cooperative for the franchised business established under this agreement. The following provisions apply to each Cooperative:

(a) Each Cooperative will be organized and governed in a form and manner prescribed or approved by Franchisor in writing, and will commence operations on a date specified by Franchisor. Any disputes arising between Franchisee and other franchisees in the Cooperative or the Cooperative, will be resolved in accordance with the rules and procedures in the Cooperative's governing documents.

(b) Each Cooperative will be organized for the exclusive purpose of administering local or regional advertising programs and developing, subject to Franchisor's approval, standardized promotional materials for use by the members in local advertising and promotion.

(c) No advertising or promotional plans or materials may be used by a Cooperative or furnished to its members without the prior approval of Franchisor pursuant to the procedures in section 11.7 of this agreement.

(d) Each month that a Cooperative is in existence for Franchisee's geographical area, Franchisee shall contribute to the Cooperative an amount specified by Franchisor or the Cooperative (the "<u>Cooperative Contribution</u>"). Franchisee's Cooperative Contribution will not be credited towards the National Branding Fee required by section 5.2 of this agreement.

(e) The members of the Cooperative will determine the amount of the Cooperative Contribution in accordance with its governing documents, but the Cooperative Contribution may not exceed three percent of Franchisee's Gross Revenues unless the members of the Cooperative, by a majority vote conducted in accordance with its rules, bylaws, or other governing documents, agree to a Cooperative Contribution in excess thereof. Franchisee shall pay its Cooperative Contribution, together with any statements or reports that Franchisor or the Cooperative (with Franchisor's prior written approval) may require, on a date each month determined by the Cooperative, but no later than the tenth day of each month.

(f) For each Growth Coach franchise operated by Franchisor or an affiliate of Franchisor in a geographical area for which a Cooperative has been established, Franchisor shall make a Cooperative Contribution on the same basis as assessments required of comparable franchisees that are members of the same Cooperative.

(g)     Cooperatives established by Franchisor are intended to be of perpetual duration.   However, Franchisor maintains the right to terminate any Cooperative. Franchisor shall use any unexpended monies from the terminated Cooperative only for advertising or promotional purposes for the System.

ARTICLE 12

TRANSFERABILITY OF INTEREST

12.1   <u>Transfer by Franchisor.</u>  Franchisor shall have the right to transfer or assign all or any part of its rights and/or obligations herein to any person or legal entity, including a subfranchisor specifically responsible for assisting Franchisee.  Franchisee agrees to execute any forms that Franchisor may reasonably request to effectuate any transfer or assignment by Franchisor.

12.2   <u>Transfer by Franchisee.</u>

(a)     Franchisee understands and acknowledges that the rights and duties set forth in this agreement are personal to Franchisee, and that Franchisor has entered into this Agreement in reliance upon Franchisee's business skills and financial capacity.  Accordingly, neither Franchisee, nor any shareholder, member or partner of Franchisee, nor any immediate or remote successor to any part of Franchisee's interest in the Franchise, shall sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise encumber any interest therein or in Franchisee without the prior written consent of Franchisor.  Any purported assignment or transfer, by operation of law or otherwise, not having the written consent of Franchisor, shall be null and void and shall constitute a material breach of this Agreement, for which Franchisor may then terminate without opportunity to cure pursuant to Article 13 herein.  Franchisee may transfer only that Territory delineated by Postal ZIP Codes and described in Exhibit B to this Agreement.  No purported or attempted assignment or transfer of Franchisee's right to operate the franchised business or use the System or the Marks in less than the entire Territory will be valid.

(b)     Except as provided in this Article 12, Franchisor shall not unreasonably withhold its consent to a transfer of any interest in Franchisee or in this Franchise; provided, however, that prior to the transfer, Franchisor may, in its sole discretion, require that:

(1)     All of Franchisee's accrued monetary obligations to Franchisor or any of its affiliates, and all other outstanding obligations related to the franchised business (including, without limitation, obligations under any promissory note in favor of Franchisor or its affiliates) shall have been satisfied;

(2)     The transferor's right to receive compensation pursuant to any agreement for the purchase of any interest in Franchisee or in Franchisee's Franchise shall be subordinated and secondary to Franchisor's rights to receive any outstanding monetary obligations or other outstanding obligations due from transferor or Franchisee pursuant to this Agreement, whether arising before or after the transfer;

(3)     Franchisee shall have executed a general release in a form satisfactory to Franchisor, effective as of the date of transfer, of any and all claims against Franchisor and its officers, directors, shareholders, and

employees, in their corporate and individual capacities, including, without limitation, claims arising under federal, state and local laws, rules and ordinances;

(4)     The transferee franchisee shall enter into a written assumption, in a form satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement prior to and after the date of the assumption;

(5)     The transferee franchisee shall demonstrate to Franchisor's satisfaction that it meets Franchisor's educational, managerial and business standards; possesses a good moral character, business reputation, and credit rating; has the aptitude and ability to conduct the franchised business (as may be evidenced by prior related business experience or otherwise), and has adequate financial resources and capital to operate the business;

(6)     The transferee franchisee shall execute Franchisor's then current form of Franchise Agreement and such other ancillary agreements as Franchisor may require, for a term ending on the expiration date of this Agreement or two years from the effective date of the transfer, whichever is later, with such renewal term as is provided in Section 2.2 of this Agreement;

(7)     At the transferee franchisee's expense, and upon such other terms and conditions as Franchisor may reasonably require, the transferee franchisee or its manager shall complete the training course then in effect for franchisees;

(8)     Any right of Franchisee to any payments from the transferee franchisee resulting from the transfer shall be subordinate to any claim or right of Franchisor against the transferee franchisee subsequent to the effective date of the transfer, and Franchisee and the transferee franchisee shall execute any and all instruments reasonably required by Franchisor to evidence such liability; and,

(9)     Either Franchisee or the transferee franchisee shall pay to Franchisor a transfer fee of the greater of Ten Thousand Dollars ($10,000) or three percent (3%) of all consideration of any kind payable to Franchisee in connection with the transfer, plus Franchisor's actual legal and other expenses incurred in connection with the transfer.  No transfer fee will be required in the case of a transfer (i) of any interest in the franchised business to the spouse or direct lineal descendant of Franchisee or one of its Principals; (ii) of less than 50% of the ownership interest of a non-individual Franchisee; or (iii) of the entire franchised business to an entity formed solely for the convenience of ownership in accordance with the provisions of Section 12.3 below, if, immediately after the transfer, Franchisee will beneficially own a controlling interest in the entity. If Franchisee is other than an individual, no transfer fee will be required in the case of a transfer of a non-controlling ownership interest in Franchisee.  For purposes of this subparagraph (9), all transfers of an ownership interest in Franchisee occurring since the date Franchisee first became a Growth Coach franchisee shall be aggregated to determine the ownership percentage being transferred.

(10)    Franchisee and transferee franchisee shall acknowledge in writing that Franchisor was not involved in the negotiation of the transfer, does not guarantee the accuracy of any information provided by Franchisee to transferee franchisee, and makes no representations regarding the transferee franchisee's likelihood of success in operating the franchisee.

(11)    Franchisee shall comply with the requirements of section 10.3 above relating to the disclosure of confidential information to a prospective transferee franchisee.

(12)    Franchisee shall comply with all laws that apply to the transfer, including laws governing the offer and sale of franchises.  Franchisee shall indemnify and defend Franchisor and its agents against and hold them harmless from any and all claims arising directly or indirectly from any alleged failure on Franchisee's part to comply with any franchise law or other law applicable to the transfer.

(13)    The Transferee Franchisee, at its own expense, must satisfy all applicable licensing requirements of the jurisdiction in which the franchised business is located.

(14)    In connection with any proposed transfer, Franchisor has the right to communicate with any prospective transferee and to make available for inspection by any prospective transferee all or part of Franchisor's records relating to this agreement, the business operations, financial condition, contracts, and history of the franchised business under Franchisee's ownership, or the history of the relationship of the parties, without any liability to Franchisee or its affiliates, directors, officers, employees, or agents. Franchisee hereby specifically consents to such disclosure by Franchisor and absolutely releases and agrees to hold Franchisor harmless from any and all claims arising directly or indirectly therefrom.

(c)    Notwithstanding the provisions of Subsection 12.2(b) above, neither Franchisee nor any Principal of Franchisee, nor any immediate or remote successor to any part of Franchisee's interest in the franchised business, shall pledge, mortgage, grant a security interest, or otherwise encumber any interest in this Agreement, in the franchise granted hereunder, or in Franchisee (whether or not in connection with an absolute transfer of an interest in the franchised business). Franchisor shall not be obliged to consent to any such transfer.

(d)    Notwithstanding the provisions of subsection 12.2(b) above, Franchisor is not obligated to consent to any Transfer to a person that owns, operates, franchises, licenses, develops, consults with, manages, is involved in or employed by, or controls a competitive business.  If Franchisor refuses to consent to a transfer under this paragraph, the sole remedy of Franchisee will be to seek a declaratory judgment in a court of competent jurisdiction to determine whether the proposed transferee is a person that owns, operates, franchises, licenses, develops, consults with, manages, is involved in or employed by, or controls a competitive business.

12.3    Transfer to Controlled Entity.  Franchisee may transfer all of its interest in the Franchise to an entity formed solely for the convenience of ownership, without Franchisor's consent, upon Franchisee's prior written notice to Franchisor and compliance with the following requirements:

(a)    The transferee entity shall be newly organized and its charter or partnership agreement shall provide that its activities are confined exclusively to operating the Franchise;

(b)    Franchisee shall own a controlling interest in the transferee entity, shall not diminish its ownership interest in the transferee entity, except as may be required by law, and shall act as its principal executive, operating officer, or managing member or partner;

(c)    Franchisee, prior to the transfer, shall have provided Franchisor with written information as to each Principal of the transferee entity, and the interest of each, and shall promptly notify Franchisor of any changes in any such information during the term of this Agreement;

(d)    All Principals of the transferee entity shall enter into an agreement, in a form satisfactory to Franchisor, unconditionally guaranteeing the full payment and performance of the transferee entity's obligations to Franchisor;

(e)    Each ownership certificate of the transferee entity shall have conspicuously endorsed upon its face the following legend:

"The transfer, sale or pledge of these shares is subject to the terms and conditions of a Franchise Agreement with G.C. Franchising Systems, Inc.";

(f)    Copies of the transferee entity's articles of incorporation or organization, by-laws, partnership or operating agreement, and other governing documents, including the resolutions of its Principals or governing board authorizing the execution of this Agreement, shall be furnished to Franchisor for its approval prior to the transfer;

(g)    The name of the transferee entity shall not consist of or contain the Marks or any colorable variation thereof or any other mark in which Franchisor has or claims a proprietary interest; however Franchisee shall use THE GROWTH COACH with its assigned franchise number for its assumed name (i.e. dba); and

(h)    Franchisee shall reimburse Franchisor for actual legal and other costs incurred by Franchisor in approving and effecting the transfer.

12.4    Franchisor's Right of First Refusal.  If Franchisee or its owners shall at any time decide to sell, transfer or assign any right or interest under this Agreement and/or the franchise granted pursuant hereto, Franchisee or its owners shall first obtain a bona fide, executed, written offer from a responsible and fully disclosed purchaser and shall submit an exact copy thereof to Franchisor. For a period of thirty days after the date of delivery of such offer to Franchisor, Franchisor shall have the right, exercisable by written notice to Franchisee or any of its owners, to purchase such rights or interests for the price and on the terms and conditions contained in such offer, provided that Franchisor may substitute equivalent cash for any form of payment proposed in such offer. Any purchase by Franchisor must be completed within sixty days after Franchisee's receipt of Franchisor's written notice of its intent to purchase. If Franchisor does not exercise its right of first refusal, Franchisee or its owners may complete the sale of such interest to the bona fide purchaser,

subject to Franchisor's approval of the purchaser as provided in Section 12.2 herein; provided, however, that if the sale to such purchaser is not completed within one hundred twenty (120) days after the delivery of the offer to Franchisor, Franchisor shall again have the right of first refusal herein provided.

12.5    Right of Franchisee's Heirs Upon Death, Disability or Dissolution of Franchisee.  A transfer to the heirs, surviving spouse, conservators, or personal or other legal representative of the Franchisee (collectively, "Involuntary Transferees") upon the death, dissolution or legal disability of the Franchisee or of a partner, shareholder or member owning a fifty percent (50%) or greater equity interest in the Franchisee, shall not be subject to Franchisor's right of first refusal under Section 12.4 or right to terminate for failure to obtain written approval under Section 12.2(a), so long as the Involuntary Transferees (i) satisfy Franchisor that they are qualified to act as a Franchisee pursuant to Section 12.2(b)(5) herein or retain an individual or entity to operate and manage the franchised business who is so qualified and who is approved in writing by Franchisor, and (ii) perform all other applicable acts required under Section 12.2 herein.  Such transfer must be made within ninety days after Franchisee's death, disability, or dissolution.  Any subsequent sale or other transfer by any Involuntary Transferees shall be subject to Franchisor's right of written approval set forth in Section 12.2 and to Franchisor's right of first refusal set forth in Section 12.4.  A transfer to Involuntary Transferees shall not require the payment of the transfer fee required by Section 12.2(b)(9).  Actual legal costs incurred by Franchisor to approve and effect the transfer will be charged, however.

ARTICLE 13

TERMINATION

13.1    Events Allowing Termination.  Franchisor may terminate this Agreement, without refund of any moneys paid to Franchisor by Franchisee, if Franchisee (or Franchisee's designee) fails to commence the initial training program within ninety days after the execution of this Agreement, fails to complete the training program to the satisfaction of Franchisor, or fails to open the franchised business within ninety days after Franchisee's (or Franchisee's designee's) completion of the initial training program.  After the commencement of business operations by Franchisee, and subject to the notice provision set forth in Section 13.2 below, Franchisor may elect, without prejudice to any other rights or remedies that it may have hereunder, at law or in equity, to terminate this Agreement upon the occurrence of any one or more of the following events:

(a)    Franchisee fails to pay when due any sum required to be paid by Franchisee under this Agreement, the promissory notes described in Article 4 above, or any other agreement or instrument to which Franchisor and Franchisee are parties;

(b)    Franchisee fails to furnish when due any report required by this Agreement;

(c)    Franchisee fails to operate its Franchise in compliance with the terms of this Agreement, the Manual or the System Standards;

(d)    Franchisee fails to perform or breaches any provision of this Agreement or any other agreement to which Franchisor and Franchisee are parties;

(e)    Franchisee understates its Gross Revenues reported to Franchisor by 3% or more for any month subject to inspection by Franchisor;

(f)     Franchisee sells, promotes, or performs for compensation any Permitted Products and Services, or otherwise operates the franchised business, within a franchise territory licensed to another franchisee of Franchisor (except as may be expressly permitted by this Agreement or the Manual), or otherwise infringes upon rights granted under franchise agreements with other franchisees of Franchisor;

(g)     Franchisee is declared bankrupt or insolvent or Franchisee is the debtor in a voluntary or involuntary bankruptcy proceeding under the U.S. Bankruptcy Code (this provision may not be enforceable under federal bankruptcy law);

(h)     A receiver is appointed for Franchisee or any part of its property, or Franchisee makes an assignment for the benefit of its creditors, if not dismissed within fifteen days;

(i)     After opening the franchised business, Franchisee fails to maintain it in continuous operation;

(j)     Franchisee fails, for a period of ten days after receipt of notification of noncompliance (regardless of the source of the notice), to comply with any federal, state or local law or regulation applicable to the operation of the franchised business;

(k)     Any attempted transfer or assignment that fails to comply with the provisions of Article 12 of this Agreement;

(l)     Any material misrepresentation by Franchisee relating to its acquisition of its Franchise;

(m)     Any failure to maintain required liability insurance policies;

(n)     The franchised business or the Premises are seized, taken over or foreclosed by a government official in the exercise of his duties, or seized, taken over or foreclosed by a creditor, lien holder or lessor, provided that a final judgment against the Franchisee remains unsatisfied for thirty days (unless a supersedeas or other appeal bond has been filed); or a levy of execution has been made upon the license granted by this Agreement or upon any property used in the franchised business that is not discharged within five days of such levy;

(o)     Any conduct or activity by Franchisee or any Principal, director, or officer of Franchisee that, in Franchisor's sole discretion, may harm, tarnish, impair or reflect unfavorably upon the reputation, name, services or operation of the franchised business, Franchisor, the System or the Marks, including, without limitation, any criminal misconduct of which Franchisee or any Principal, director, or officer of Franchisee is convicted;

(p)     Franchisee knowingly maintains false books or records, or knowingly submits any false reports (including, but not limited to, information provided as part of Franchisee's application for this franchise) to Franchisor, or knowingly understates its Gross Revenues reported to Franchisor;

(q)     The intentional, willful or fraudulent sale or provision for compensation of any Permitted Products and Services, or other operation of the franchised business, within a franchise territory licensed to another franchisee of Franchisor (except as

may be expressly permitted by this Agreement or the Manual), or any other intentional, willful or fraudulent infringement upon rights granted under franchise agreements with other franchisees of Franchisor; or

(r)     Franchisor's reasonable determination that the continued operation of the Franchise by Franchisee will result in immediate danger to public health or safety.

(s)     Franchisee employs any person or fails to discharge any employee that Franchisee knows or has reason to know has engaged in, been convicted of, or pled guilty or nolo contendere to any felony, fraud, elder abuse, or any crime involving moral turpitude.

(t)     Franchisee continues an unauthorized use of the Marks for more than three days after Franchisee receives a notice to cease from Franchisor;

(u)     Franchisee knowingly and without authorization discloses the Manual to a third-party.

(v)     Franchisee fails to maintain nay license required by law to offer, provide, or sell any Permitted Products and Services.

13.2    <u>Notice; Termination.</u>

(a)    If Franchisee fails to cure any default within thirty (30) days after its receipt of a written notice of breach from Franchisor, Franchisor may terminate this Agreement, except that no written notice of default or opportunity to cure shall be required in the case of a default described in subsections 13.1(g) through (v) above.   If Franchisee defaults on this Agreement two separate times, for each of which Franchisee was given notice and an opportunity to cure, then Franchisor may terminate this Agreement upon any subsequent default without providing notice or opportunity to cure.  Termination of this Agreement shall, at Franchisor's option, be effective automatically upon the expiration of the time period specified above (or such longer period as may be required by applicable law) if Franchisee fails to cure the default within such period, or, if no notice of default is required, immediately upon Franchisee's receipt of a written notice of termination.

(b)    In addition to and without limiting any other remedies provided in this Agreement, if Franchisor at any time has the right to terminate this Agreement, then Franchisor, in its sole and unfettered discretion, also has the right to suspend Franchisee's non-exclusive license to use the Marks and the System granted by Section 1.1 until any and all breaches of this Agreement have been cured or this Agreement has been terminated.

(c)    If Franchisee fails to cure any default within thirty (30) days after its receipt of a written notice of breach from Franchisor, then the exclusivity of the Franchise Territory granted by Section 1.3 shall be automatically suspended without further notice until the breach has been cured or this Agreement has been terminated.

(d)    If Franchisee breaches any term of this Agreement, then Franchisee, if it has not already done so, shall execute and deliver to Franchisor an authorization for electronic transfer of funds (in a form prescribed by or acceptable to Franchisor's and Franchisee's banks) for direct debits from Franchisee's bank account as provided in Section 5.5, and comply with procedures specified by Franchisor and perform take all other actions necessary to make payments by electronic fund transfer or pre-authorized electronic debit.

13.3    Liability for Breach.  If Franchisee fails to cure any breach within the applicable time period set forth in Section 13.2 above, Franchisee shall pay to Franchisor all damages, costs and expenses incurred by Franchisor as a result of any such breach, including, but not limited to, reasonable attorney and accounting fees.  This provision shall apply regardless of whether or not Franchisor exercises its right to terminate this Agreement.

ARTICLE 14

OBLIGATIONS UPON TERMINATION

14.1    Franchisee's Obligations.  Upon the termination or expiration of this Agreement, Franchisee shall forthwith:

(a)    Cease to operate the Franchise and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor;

(b)    Except as may be authorized under another franchise agreement in effect between Franchisee and Franchisor, Franchisee shall immediately and permanently cease all use of the Marks and any derivative or confusingly similar variation thereof.  Without limiting the generality of the preceding sentence, Franchisee's obligations under this paragraph include permanently discontinuing all Internet advertising (including, by way of example, Facebook, LinkedIn, Plaxo, MySpace, Twitter, Naymz, Service Magic, Google, and pay-per-click programs) containing any of the Marks or any derivative or confusingly similar variation thereof;

(c)    Except as may be authorized under another franchise agreement in effect between Franchisee and Franchisor, Franchisee shall immediately and permanently cease to use, by advertising or in any manner whatsoever, any equipment, materials, confidential methods, procedures, or techniques associated with the System or that display the Marks or any other distinctive forms, slogans, signs, symbols, or devices associated with or belonging to Franchisor;

(d)    Make such modifications or alterations to the Premises (including, without limitation, the changing of all telephone numbers), including the improvements thereon, as may be necessary or requested by Franchisor to prevent the operation of any business on the Premises that might be deemed substantially similar to that of Franchisor or any other franchisee of Franchisor.  If Franchisee fails or refuses to comply with the requirements of this Section, Franchisor shall have the right to enter the Premises, without being guilty of trespass or any other tort or crime, for the purposes of making or causing to be made such changes as may be required at the expense of Franchisee;

(e)    Turn over to Franchisor all Manuals, records, client and other files including client lists and agreements with clients, instructions, correspondence, and materials, including, without limitation, brochures, agreements, disclosure statements and any materials relating to the business operated hereunder, which may be in Franchisee's possession, together with all copies thereof (all of which Franchisee acknowledges to be Franchisor's sole property);

(f)     Promptly notify the telephone company and all listing agencies of the termination or expiration of Franchisee's right to use the telephone numbers and directory listings used in connection with the franchised business and authorize the transfer of the telephone numbers and directory listings to Franchisor or its designee.  Franchisee acknowledges that, as between Franchisor and Franchisee, Franchisor has the sole right to all telephone numbers and directory listings used in connection with the franchised business, and Franchisee hereby authorizes Franchisor, and appoints Franchisor and any officer designated by Franchisor, as Franchisee's attorney-in-fact, to direct the telephone company and all listing agencies to transfer the telephone numbers and directory listings to Franchisor or Franchisor's designee if Franchisee fails or refuses to do so.  The telephone company and all listing agencies may accept such direction or this agreement as conclusive of Franchisor's exclusive rights in the telephone numbers and directory listings and Franchisor's authority to direct their transfer;

(g)     At Franchisor's option, cancel or assign to Franchisor or Franchisor's designee all of Franchisee's right, title and interest in and to any and all (i) telephone numbers of Franchisee's franchise and all related Yellow Pages, White Pages and other business listings, and (ii) Web sites, Web pages, listings, banners, URLs, advertisements or any other services and links related to Franchisee's business or use of Franchisor's trademarks, service marks or other logos, on or with the Internet, World Wide Web, Internet service providers, electronic mail services, communication providers, search engines or other similar services;

(h)     Immediately pay all sums due and owing to Franchisor, including any unpaid National Branding Fees, Royalties and balance due on any Installment Note; and

(i)     Take such action as may be necessary to cancel any assumed name or equivalent registration that contains the mark GROWTH COACH or any of the other Marks, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within fifteen days after termination or expiration of this Agreement.

14.2   Power of Attorney.  Franchisee does hereby irrevocably constitute and appoint Franchisor as its true and lawful attorney-in-fact and agent to carry out Franchisee's obligations under this Article 14.  Franchisee agrees to promptly execute, acknowledge and deliver to Franchisor any and all such documents as may be required to carry out Franchisee's obligations hereunder.  The provisions of this Article 14 shall survive the expiration, termination or cancellation of this Agreement.

## ARTICLE 15

## COVENANTS

15.1   Management of Franchise.  Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee or a person designated by Franchisee who has been approved in writing by Franchisor and has successfully completed the training program required by Section 7.1 hereof, shall devote his full time, energy, and best efforts to the management and operation of the franchised business.

15.2   Covenants During Term of Franchise Agreement.  Franchisee specifically acknowledges that, pursuant to this Agreement, Franchisee will receive valuable specialized training and confidential information, including, without limitation, information regarding the design, development

and operation of the franchised business, and the sales, promotional, and marketing methods and techniques of Franchisor and the System. Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee shall not, either directly or indirectly, for itself or through, on behalf of, or in conjunction with, any person or entity:

(a)   divert or attempt to divert any business or customer of the franchised business or of any other franchisee of Franchisor to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System;

(b)   aid, assist, or provide goods or services to, any competitor of the franchised business, Franchisor, or any other franchisee in the System;

(c)   employ or seek to employ any person who is at that time employed by Franchisor or any franchisee of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment;

(d)   own, maintain, engage in, or have any interest in any business offering business management or personal development coaching or consulting services, or any other services that are offered in the franchised business, unless otherwise consented to in writing by the Franchisor; or

(e)   sell or perform for compensation any Permitted Products and Services, or otherwise operate the franchised business, within a franchise territory licensed to another franchisee of Franchisor (except as may be expressly permitted by this Agreement or the Manual), or otherwise infringe upon rights granted under franchise agreements with other franchisees of Franchisor.

(f)   take any action injurious or prejudicial to the System.

15.3   <u>Noncompetition Covenant</u>.  Franchisee shall not, for a continuous and uninterrupted period commencing upon the expiration or termination of this Agreement (regardless of the cause for termination) and continuing for two years thereafter, directly or indirectly, for itself or through, on behalf of, or in conjunction with any person or entity, own, maintain, operate, engage in, or have any interest in any business offering business management or personal development coaching or consulting services, or any other services that had been offered by the franchised business, that is or is intended to be located or which operates in or within 15 miles of the geographical boundary of Franchisee's Territory or in or within 15 miles of the geographical boundary of any other Growth Coach franchisee's Territory. The two-year time period referred to in this paragraph will be stayed during any violation or breach of the terms of this paragraph. The covenants in this paragraph will survive the expiration, termination or cancellation of this Agreement. The covenants contained in this paragraph are severable and contain different but overlapping restrictions that shall be enforced simultaneously whenever permitted by applicable law. If any provision of any covenant shall be held to be invalid or unenforceable in any respect, Franchisor and Franchisee agree that such provision shall be modified to the extent necessary to permit its enforcement, and the remaining provisions shall be unaffected thereby. Franchisee specifically acknowledges and agrees that the geographic and temporal restrictions on Franchisee's ability to compete with Franchisor and Franchisor's franchisees are reasonable and necessary to protect Franchisor's business interests in the relevant markets.

15.4   <u>Nonsolicitation of Clients and Shared Referral Sources</u>.  Franchisee shall not, directly or indirectly, for itself or through, on behalf of, or in conjunction with any person or entity for a

continuous and uninterrupted period commencing upon the expiration or termination of this Agreement (regardless of the cause for termination) and continuing for two years thereafter, directly or indirectly: (i) solicit or perform services for any person who was a client of the franchised business at any time during the term of this Agreement; or (ii) promote or solicit referrals for business management or personal development coaching or consulting services, any Permitted Products and Services, or any other services that had been offered by the franchised business, from any Shared Referral Source (as defined in Section 1.5 above) located in the Territory. The two-year time period referred to in this paragraph will be stayed during any violation or breach of the terms of this paragraph. The covenant in this paragraph will survive the expiration, termination or cancellation of this Agreement.

15.5    Exclusion for Publicly Traded Company. Section 15.3 shall not apply to the beneficial ownership by Franchisee of less than five percent (5%) of the outstanding equity securities of any corporation that is registered under the Securities and Exchange Act of 1934.

15.6    Independent Covenants; Severability. The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Article 15 is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which Franchisor is a party, Franchisee expressly agrees to be bound by any lesser covenants subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenants were separately stated in and made a part of this Article 15.

15.7    Reduction of Covenants by Franchisor. Franchisee understands and acknowledges that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in Sections 15.2 and 15.3 of this Agreement, or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof, and Franchisee agrees that it shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 18.1 hereof.

15.8    Claims Against Franchisor No Defense. Franchisee expressly agrees that the existence of any claims it may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Article 15.

15.9    Injunctive Relief. Franchisee acknowledges that Franchisee's violation of the terms of this Article 15 would result in irreparable injury to Franchisor for which no adequate remedy at law may be available; and Franchisee accordingly consents to the issuance of, and agrees to pay all court costs and reasonable attorneys' fees incurred by Franchisor in obtaining, an injunction prohibiting any conduct by Franchisee in violation of the terms of this Article 15.

15.10   Execution of Covenants by Franchisee's Officers, Etc. Franchisee shall provide Franchisor with executed "Restrictive Covenant Agreements", similar in substance to those set forth in this Article 15 (including covenants applicable upon the termination of a person's relationship with Franchisee), from each of the following persons: (1) all officer's, directors, and holders of a direct or indirect beneficial ownership interest in Franchisee; and (2) the general partner(s) and any limited partners (including any corporation, limited liability company, or partnership, and the officers, directors, and holders of a beneficial interest in any entity which controls, directly or indirectly, any general or limited partner) if Franchisee is a partnership. With respect to each person who becomes associated with Franchisee in one of the capacities enumerated above subsequent to the execution of this Agreement, Franchisee shall require and obtain such covenants from them and promptly provide Franchisor with executed copies thereof. In no event shall any person enumerated above be granted access to any confidential aspect of the System or the franchised

business prior to their execution of such a covenant. All covenants required by this Section 15.10 shall be in forms satisfactory to Franchisor, including, without limitation, the specific identification of Franchisor as a third-party beneficiary of such covenants with the independent right to enforce them. The failure by Franchisee to obtain the execution of the covenants required by this Section 15.10 and provide the same to Franchisor shall constitute a material breach of this Agreement.

ARTICLE 16

ENFORCEMENT

16.1    Injunctive Relief. Franchisor shall be entitled, without bond, to the entry of temporary and permanent injunctions and orders of specific performance enforcing the provisions of this Agreement relating to: (a) Franchisee's use of the Marks; (b) the obligations of Franchisee upon the termination or expiration of this Agreement; (c) the obligations of Franchisee under Sections 15.2, 15.3 or 15.4 of this Agreement; or (d) an assignment of this Agreement or any ownership interest therein; or (e) as necessary to prohibit any act or omission by Franchisee or its employees: (i) that would constitute a violation of any applicable law, ordinance, or regulation: (ii) that is dishonest or misleading to Franchisor and/or Franchisor's other franchisees; or (iii) that, in Franchisor's reasonable judgment, may harm, tarnish, impair or reflect unfavorably upon the reputation, name, services or operation of the franchised business, Franchisor, the System or the Marks.

16.2    Arbitration.

(a)    .Except as otherwise provided in this Article 16, any and all disputes between the parties, whether or not arising out of or related to this Agreement, shall be submitted to a panel of three arbitrators as provided in this paragraph. Each claim or controversy shall be arbitrated on an individual basis and shall not be consolidated in any arbitration action with the claim of any other franchisee. The arbitration proceeding shall be administered by the American Arbitration Association (AAA) in accordance with the Federal Arbitration Act and the then prevailing Commercial Arbitration Rules of the AAA. The award shall be in writing, shall be signed by a majority of the arbitrators, and shall be accompanied by a reasoned opinion. Within thirty days of receipt of any award (which shall not be binding if an appeal is taken), any party may notify the AAA of an intention to appeal to a second arbitral tribunal, constituted in the same manner as the initial tribunal. None of the arbitrators who served on the original panel shall serve on the second tribunal. The appeal tribunal shall be entitled to adopt the initial award as its own, modify the initial award, or substitute its own award for the initial award. The appeal tribunal shall not modify or replace the initial award except for clear errors of law or because of clear and convincing factual errors. The award of the appeal tribunal shall be final and binding upon the confirmation thereof by a court of competent jurisdiction. Each party shall bear its own costs and expenses in connection with the arbitration, including, but not limited to, attorney fees. The administrative fees and arbitrators' fees shall be allocated equally between the parties. The arbitration proceedings shall take place in Hamilton County, Ohio.

(b)    A party shall not have the right to appeal an award under subparagraph (a) of this Section unless the party: (i) fully cooperated in the exchange of information and discovery as ordered by the arbitration panel in the initial arbitration; (ii) attended all evidentiary hearings after due notice in the original arbitration; and (iii) paid all administrative fees, arbitrators' compensation, and other charges assessed or allocated to the party by the AAA in the original arbitration.

16.3     Exception to Arbitration.   Notwithstanding the provisions of Section 16.2 above, if the amount in controversy in any dispute between Franchisor and Franchisee exceeds $100,000 in the aggregate, Franchisor shall have the right to require that the matter be adjudicated in either the Common Pleas Court of Hamilton County, Ohio or the United States District Court for the Southern District of Ohio, in lieu of arbitration.  If an arbitration demand has already been filed in connection with such a dispute, Franchisor shall have the right to remove the matter to such court.

16.4     **WAIVER OF JURY TRIAL. EACH PARTY IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER PARTY.**

16.5     Punitive Damages.   The parties agree to waive, to the fullest extent permitted by law, the right to or claim of any punitive, exemplary or multiple damages against the other and agree that, in the event of a dispute between them, each will be limited to the recovery of actual damages sustained by it.

16.6     Limitation of Claims.   Except for

(i)     claims against Franchisee concerning the underreporting of Gross Revenues and corresponding underpayment of Royalty and National Branding Fees,

(ii)    claims against Franchisee by Franchisor relating to third party claims or suits brought against Franchisor as a result Franchisee's operation of the franchised business, and

(iii)   claims for injunctive relief to enforce the provisions of this Agreement relating to Franchisee's use of the Marks, Franchisee's obligations upon the termination or expiration of this Agreement, Franchisee's obligations under Articles 9, 10 or 15 of this Agreement, or an assignment of this Agreement or any ownership interest therein,

any and all claims arising out of or relating to this Agreement or the relationship between the parties shall be barred unless an arbitration or legal proceeding is commenced within one year from the date Franchisee or Franchisor knew or should have known of the facts giving rise to such claims.

ARTICLE 17

INDEPENDENT CONTRACTOR AND INDEMNIFICATION

It is understood and agreed that nothing in this Agreement shall create a partnership, employment or agency relationship between Franchisor and Franchisee, or authorize Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf or to incur any debt or other obligation in Franchisor's name.  Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action by Franchisee.  Franchisor shall not be liable to any third party for any act or omission of Franchisee in any of its operations hereunder (including, without limitation, any claim or action against Franchisee for negligent hiring) or any claim or judgment arising therefor against Franchisee.  Franchisee shall indemnify and hold Franchisor harmless from and against any and all claims, debts, liabilities or obligations arising directly or indirectly from, as a result of or in connection with Franchisee's operation of the franchised business, and shall pay all costs (including, without limitation, attorney and accountant fees) incurred by Franchisor in defending against and/or responding to them.  FRANCHISEE SHALL DISPLAY PROMINENTLY AT ITS PLACE OF BUSINESS, ON ALL CORRESPONDENCE WITH THIRD PARTIES, AND IN ANY PRINTED MATERIALS BEARING ITS NAME OR BUSINESS

LOCATION, A STATEMENT THAT THE FRANCHISED BUSINESS IS INDEPENDENTLY OWNED AND OPERATED BY FRANCHISEE.

## ARTICLE 18

## MISCELLANEOUS

18.1   Nature of Agreement.   This Agreement, together with its exhibits, constitutes the entire Agreement between the parties with respect to the subject matter hereof and any prior agreements and understandings between the parties relating to the same subject are hereby superseded and merged into this Agreement.   This Agreement may not be modified or amended except by written instrument signed by each of the parties hereto, expressing such amendment or modification.   No failure on the part of any party hereto to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or remedy hereunder preclude any other or further exercises thereof or the exercise of any other right, power or remedy.   Nothing in this Agreement is intended to disclaim representations made in Franchisor's Disclosure Document.

18.2   Benefit.   This Agreement is binding upon and inures to the benefit of the parties and their respective legal representatives, successors, and assigns.   This Agreement may not be assigned by Franchisee without the prior written consent of Franchisor.

18.3   Construction.   This Agreement was accepted by Franchisor in Ohio.   Except to the extent governed by the U.S. Trademark Act of 1946, the U.S. Copyright Act, the Federal Arbitration Act, and other federal statutes, the laws of the State of Ohio (without reference to Ohio conflict of laws principles) govern all aspects of this Agreement, excluding any law regulating the sale of franchises or business opportunities, or governing the relationship between a franchisor and a franchisee, unless the jurisdictional requirements of such laws are met independently without reference to this section; provided, however, that if any of the covenants contained in Article 15 of this Agreement would not be enforceable under the laws of Ohio and the franchised business is located outside of Ohio, then such covenants shall be interpreted and construed under the laws of the state in which the franchised business is located.   Ohio law shall prevail in the event of any conflict of law, except as specifically provided otherwise by any applicable state franchise investment laws, rules or regulations.   If any provision of this Agreement relating to termination, nonrenewal or assignment of the franchise or choice of law, jurisdiction or venue is inconsistent with any applicable state franchise investment law, rules or regulations, such applicable state law shall apply.   Any addendum to this Agreement required by the regulatory authorities of any state for the purpose of disclosing salient provision of such state's law is hereby made a part hereof.

18.4   Jurisdiction and Venue.   Subject to the provisions of Section 16.2 relating to the arbitration of disputes, each party hereby irrevocably agrees that all lawsuits between the parties and/or their affiliates shall be litigated only in courts having situs in Hamilton County, Ohio.   Each party agrees that the following courts have personal jurisdiction over it in all lawsuits between the parties and/or their affiliates, irrevocably submits to the jurisdiction of these courts, and irrevocably waives any defense based upon lack of personal jurisdiction in any lawsuit filed in these courts:   (a) all courts included within the state court system of the State of Ohio; and (b) all courts of the United States of America sitting within the State of Ohio, including, without limitation, all United States District Courts within the State of Ohio.   Each party agrees that venue shall be proper in any of the following courts in all lawsuits between the parties and/or their affiliates and irrevocably waives any right to transfer or change the venue in any lawsuit filed in these courts:   (a) the state court of the county where Franchisor has its principal place of business (presently Hamilton County, Ohio); and (b) the United States District Court for the Southern District of Ohio, Western Division.   If any of these courts are

abolished, venue shall be proper in the state or federal court in Ohio that most closely approximates the subject matter jurisdiction of the abolished court as well as any of these courts that are not abolished. All lawsuits filed by either party or its affiliate against the other or its affiliate (whether or not in breach of the arbitration provisions of this agreement) must be filed exclusively in one of these courts, except that claims for injunctive relief may be brought where the defendant is located. These exclusive choice of jurisdiction and venue provisions shall not restrict the ability of the parties to confirm or enforce arbitration awards in any appropriate jurisdiction. In all lawsuits between the parties and/or their affiliates, Franchisee and its Principals consent to be served with process outside the State of Ohio in the same manner that service may be made within the State of Ohio by any person authorized to make service by the laws of the state, territory, possession or country in which service is made or by any duly qualified attorney in such jurisdiction. Franchisee and its Principals hereby waive any defense they may have based upon insufficiency of service of process relating to such service. This method of service shall not be the exclusive method of service available in such lawsuits, but shall be available in addition to any other method of service allowed by law.

18.5    Headings.  The headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of any provision of this Agreement.

18.6    Notices.  All payments shall be made to the addresses listed below. All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing, shall be addressed as provided in this Section 18.6, shall be made by personal delivery, or by certified mail, postage prepaid, return receipt requested, by ordinary mail, postage prepaid, by overnight delivery service with proof of delivery, or by electronic mail, and shall be effective upon receipt or refusal thereof or forty-eight hours after deposit in the United States mail, postage prepaid.

(a)    If to Franchisor:

G.C. Franchising Systems, Inc.
10700 Montgomery Road, Suite 300
Cincinnati, Ohio 45242

or to such other persons or address as Franchisor may from time to time furnish to Franchisee;

(b)    If to Franchisee:
David Kelly

319 Bouldin Street

Baltimore, MD  21224

or to such other persons or address as Franchisee may from time to time furnish to Franchisor.

18.7    Severability.

(a)    In the event that any provision of this Agreement, in whole or in part (or the application of any provision to a specific situation), shall be held, by the final judgment of a court of competent jurisdiction after appeal or the time for appeal has expired, to be invalid, unenforceable or in violation of any federal, state or local law, regulation or ordinance applicable to this Agreement, such invalidity shall be limited to such specific provision or portion thereof (or to such situation), and this Agreement

shall be construed and applied in such manner as to minimize such invalidity. All other provisions of this Agreement shall otherwise remain in full force and effect.

(b)     If any applicable and binding law or regulation of any jurisdiction requires a greater prior notice of the termination of or refusal to renew this Agreement than is required hereunder, or the taking of some other action not required hereunder, or if under any applicable and binding law or regulation of any jurisdiction any provision of this Agreement or any specification, standard, or operating procedure prescribed by Franchisor is invalid or unenforceable, then the prior notice and/or other action required by such law or regulation shall be substituted for the comparable provisions hereof, and Franchisor shall have the unlimited right to modify such invalid or unenforceable provision, specification, standard, or operating procedure to the extent required to be valid and enforceable. Franchisor agrees to be bound by any promise or covenant imposing the maximum duty permitted by law that is subsumed within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof, or from any specification, standard, or operating procedure prescribed by Franchisor, any portion or portions that a court may hold to be unreasonable and unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order. Any such modifications to this Agreement shall be effective only in such jurisdiction, unless Franchisor elects to give them greater applicability, and shall be enforced as originally made and entered into in all other jurisdictions.

18.8     <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

18.9     <u>Survival of Covenants</u>. All provisions of this Agreement which, by their terms, are intended to survive the termination or expiration of this Agreement (such as, by way of illustration and not limitation, the provisions relating to confidential information, indemnification, post-termination competition, and the Marks), and all provisions hereof necessary to enforce and interpret such provisions (such as, by way of illustration and not limitation, the provisions relating to arbitration and injunctive relief), shall survive the termination, expiration or cancellation of this Agreement or the Franchise granted hereunder.

18.10     <u>No Third Party Beneficiaries</u>. Nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies upon any person or entity not a party hereto.

18.11     <u>Acknowledgment of Franchisee</u>.

(a)     Franchisee acknowledges receipt of Franchisor's Franchise Disclosure Document for Prospective Franchisees and exhibits thereto (including a list of franchisees, Franchisor's financial statements, and a copy of this Agreement) at least ten business days prior to the execution of this Franchise Agreement.

(b)     Franchisee acknowledges and agrees that Franchisor's salesmen are <u>not</u> authorized to bind Franchisor in any way.

(c)     FRANCHISEE ACKNOWLEDGES THAT THERE HAVE BEEN NO REPRESENTATIONS, WARRANTIES, INDUCEMENTS, PRO FORMAS, FORECASTS, ESTIMATES OR ANY OTHER INDUCEMENT OR STATEMENT MADE BY FRANCHISOR OR ITS AGENTS, SALESMEN, DIRECTORS,

OFFICERS, OR EMPLOYEES, OR ANY OTHER SALESMEN OR OTHER PERSON OR ENTITY REGARDING FINANCING, NET PROFITS, GROSS PROFITS, NET SALES, GROSS SALES, COSTS OR EXPENSES OF FRANCHISOR'S FRANCHISES GENERALLY OR OF ANY SPECIFIC GROWTH COACH FRANCHISE, NOR HAS FRANCHISEE RELIED UPON ANY REPRESENTATIONS, WARRANTIES, INDUCEMENTS, PRO FORMAS, FORECASTS, ESTIMATES OR ANY OTHER INDUCEMENT OR STATEMENT MADE BY FRANCHISOR OR ITS AGENTS, DIRECTORS, OFFICERS, EMPLOYEES OR SALESMEN OR OTHER ASSOCIATES REGARDING FINANCING, NET PROFITS, GROSS PROFITS, NET SALES, GROSS SALES, COSTS OR EXPENSES OF FRANCHISOR'S FRANCHISES GENERALLY OR OF ANY SPECIFIC GROWTH COACH FRANCHISE OR WITH RESPECT TO ANY OTHER MATERIAL FACT RELATING TO THE DEVELOPMENT OF FRANCHISOR'S FRANCHISES IN THE AREA WHEREIN THE FRANCHISEE INTENDS TO LOCATE ITS GROWTH COACH FRANCHISE OR ANY OTHER MATTER PERTAINING TO FRANCHISOR.

(d)     THERE IS NO OTHER AGREEMENT, REPRESENTATION OR WARRANTY MADE BY FRANCHISOR OR ANY OTHER ENTITY OR PERSON ASSOCIATED WITH FRANCHISOR OTHER THAN CONTAINED IN THIS AGREEMENT OR FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT FOR PROSPECTIVE FRANCHISEES.

18.12 <u>"Franchisee" Defined</u>.  The term "Franchisee" includes all persons who succeed to the interest of the original Franchisee by permitted transfer or operation of law, and will be deemed to include not only the individuals or entity defined as the "Franchisee" on the attached Exhibit A, but also all Principals of the entity that executes this Agreement.  By signing this Agreement, each of the Principals of the entity that executes this Agreement as Franchisee acknowledges and accepts the duties and obligations imposed upon each of them, individually, by this Agreement.  All Principals of the entity that executes this Agreement must, by separate agreement, personally guarantee all of Franchisee's obligations to Franchisor.  If two or more individuals are the "Franchisee" under this Agreement, their liability to Franchisor is joint and several.

The parties are signing this Agreement on the dates below, the latest of which is the "<u>Effective Date</u>" of this Agreement.

G.C. FRANCHISING SYSTEMS, INC., Franchisor

By: _____     Date: _____5/1/13_____

Its: _____CEO_____

INDIVIDUAL/PARTNERSHIP FRANCHISEE(S):

_____     Date: ___12/17/2012_____
*Signature*

_____     Date: _____
*Signature*

CORPORATE/LIMITED LIABILITY COMPANY FRANCHISEE:

_____

*[Name of corporation or limited liability
company]*

By: _____     Date: _____

Its: _____

STATE OF _____, COUNTY OF _____, Ss.

On _____, before me, a Notary Public in and for said County and State, personally appeared
_____, who acknowledged that they executed the foregoing instrument.

_____
NOTARY PUBLIC

FRANCHISE AGREEMENT
EXHIBIT A

IDENTIFICATION OF FRANCHISEE(S)

INDIVIDUAL FRANCHISEE(S)

Name: _Davio S. Kelly_____ Date of Birth: _7 | 8 | 71_____

Home Address (P.O. Box not acceptable): _319 S. Bouloin Street___

City: _Baltimore_____ State: _MD____ ZIP: _21224___

Home Telephone: _443 370 6530_____ SSN: _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___

Name: _____ Date of Birth:_____

Home Address (P.O. Box not acceptable): _____

City: _____ State: _____ ZIP: _____

Home Telephone: _____ SSN: _____

ORGANIZATION FRANCHISEE

*Check One*: ☐ Corporation ☐ Limited Liability Company ☐ Partnership

Name of Organization: _____

Address:_____

City: _____ State: _____ ZIP: _____

Telephone:_____ EIN:_____

Date of Organization:_____ State of Organization:_____

Statutory/Registered Agent:_____

Address of Agent: _____

City: _____ State: _____ ZIP: _____

Officers

President:_____ Vice President: _____

Treasurer: _____ Secretary:_____

Shareholders/Members/Partners

Name: _____ Percentage of Ownership: _____

Home Address: _____

City: _____ State: _____ ZIP: _____

Home Telephone: _____ SSN: _____

Name: _____ Percentage of Ownership: _____

Home Address: _____

City: _____ State: _____ ZIP: _____

Home Telephone: _____ SSN: _____

Name: _____ Percentage of Ownership: _____

Home Address: _____

City: _____ State: _____ ZIP: _____

Home Telephone: _____ SSN: _____

Name: _____ Percentage of Ownership: _____

Home Address: _____

City: _____ State: _____ ZIP: _____

Home Telephone: _____ SSN: _____

The undersigned individual Franchisee, or each of the individual owners of a corporate, partnership, or limited liability company Franchisee, hereby certify that the foregoing information is accurate and complete to the best of their knowledge and agree to notify Franchisor promptly of any change in any such information during the term of the Franchise Agreement to which this Exhibit A is attached.

_____        _____
Signature                                Signature

David S. Kelly
_____        _____
Print Name                               Print Name

Date: __12/21/12_____            Date: _____

_____        _____
Signature                                Signature

_____        _____
Print Name                               Print Name

Date: _____          Date: _____

FRANCHISE AGREEMENT
<u>EXHIBIT B</u>

The Territory referenced in Section 1.2 of the Franchise Agreement to which this Exhibit B is attached consists of the following Postal ZIP Codes located in the State of Maryland:

| | |
|---|---|
| **21030** | **21234** |
| **21031** | **21236** |
| **21093** | **21252** |
| **21204** | **21286** |
| **21208** | **XXXXXXXX** |
| **21209** | **XXXXXXXX** |

This Exhibit B is attached to, incorporated in and made a part of said Franchise Agreement between Franchisor and Franchisee.

The parties are signing this Exhibit as of the dates below.

FRANCHISEE(S):

_____
*Signature*

Davis S. Kelly
Print Name

_____
*Signature*

_____
Print Name

_____
*Signature*

_____
Print Name

Date: 12 / 17 / 2012

FRANCHISOR:

G.C. FRANCHISING SYSTEMS, INC.

By: _____, CEO

Date: 5 / 1 / 13

# PERSONAL GUARANTY

IN CONSIDERATION for, and as an inducement for G.C. Franchising Systems, Inc. ("*Franchisor*") to enter into the Franchise Agreement (and, if applicable, the Installment Note) to which this Guaranty is attached (collectively the "*Franchise Documents*"), the undersigned ("*Guarantors*") hereby jointly and severally guarantee to the Franchisor, and to the Franchisor's successors and assigns: (a) the timely payment of all franchise and other fees, charges, and interest provided for in the Franchise Agreement; (b) the timely payment of all principal, interest and other charges provided for in the Installment Note; and (c) the timely performance of all of the provisions of the Franchise Documents for and during the term thereof (including all renewals thereof, if any). Guarantors further specifically agree to be individually bound by all covenants, obligations and commitments of the Franchisee contained in the Franchise Documents to the same extent as if each of the Guarantors had individually executed the Franchise Documents as Franchisee.

Guarantors understand and agree that any modification of the Franchise Documents, including any addendum or addenda thereto, or waiver by the Franchisor of the performance by the Franchisee of its obligations thereunder, or the giving by the Franchisor of any extension of time for the performance of any of the obligations of the Franchisee thereunder, or any other forbearance on the part of the Franchisor or any failure by the Franchisor to enforce any of its rights under the Franchise Documents, including any addendum or addenda thereto, shall not in any way release Guarantors from liability hereunder or terminate, affect or diminish the validity of this Guaranty, except to the same extent, but only to such extent, that the liability or obligation of the Franchisee is so released, terminated, affected or diminished. Notice to Guarantors of any such modification, waver, extension or forbearance under the terms thereof is hereby waived.

Guarantors hereby waive any and all notice of default on the part of the Franchisee; waive exhausting of recourse against the Franchisee; and consent to any assignment of the Franchise Documents, in whole or in part, that the Franchisor or its assignees may make. Guarantors agree to pay all costs, including reasonable attorneys' fees, incurred by Franchisor to collect or otherwise enforce the terms of this Guaranty. This Guaranty has been delivered in the State of Ohio, and shall be construed and enforced in accordance with the laws thereof. Jurisdiction and venue in any action to enforce this Guaranty shall be in any state or federal court within the State of Ohio in the judicial district where Franchisor has its principal place of business. Guarantors consent to the exercise of personal jurisdiction by any such court and waive any defense of lack of personal jurisdiction or improper venue.

_____          _____
           Guarantor                                                            Guarantor

_____          _____
           Print Name                                                          Print Name

Date: _____          Date: _____

Franchisee: <u>David Kelly</u>_____          Franchise No.<u>75750</u>

## DURABLE IRREVOCABLE POWER OF ATTORNEY
### [Individual Franchisee]

THIS POWER OF ATTORNEY is executed by each of the undersigned individual(s) (the "Principals") in favor of G.C. FRANCHISING SYSTEMS, INC., an Ohio corporation ("Franchisor").

### PREAMBLE:

A. Franchisor does business under, and licenses independently-owned franchisees to use the name GROWTH COACH.

B. Franchisor owns and has registered the trademark GROWTH COACH with the United States Patent and Trademark Office (Reg. Nos. 2,436,120 and 3,514,588).

C. Under a Franchise Agreement dated _____, Franchisor granted the Principals the limited right to operate a business coaching and consulting business (a "GROWTH COACH Franchise") using Franchisor's Marks (defined in the last paragraph of this instrument) and unique business format.

D. The Principals' use of Franchisor's Marks under the Franchise Agreement is conditioned upon, among other things, the execution of this Power of Attorney by all the Principals.

E. Each of the Principals acknowledges that Franchisor has the right and the obligation to control the use of its trademarks, and that the purpose of this Power of Attorney is to protect Franchisor's rights in its Marks.

THEREFORE, to induce Franchisor's execution of the Franchise Agreement and as additional consideration for the rights granted to the Principals thereunder, each Principal does hereby irrevocably constitute and appoint Franchisor as its true and lawful attorney-in-fact and agent, in the Principal's individual name, place and stead, to do or cause to be done all things, and to execute, acknowledge, certify, deliver, accept, record and file all agreements, certificates, instruments and documents, as may be necessary or advisable for the purpose of transferring to Franchisor, or to any person or entity designated by Franchisor in its sole and unfettered discretion, all of the Principal's rights and interest in, title to, and control over:

1. Each of the following telephone numbers, each of which is or has been used in connection with the GROWTH COACH Franchise operated by the Principal:

|  |  |  |
|---|---|---|
|  |  | ; |

2. All other telephone numbers that, at any time after the date of this Power of Attorney, have been used in connection with a GROWTH COACH Franchise operated by the Principal;

3. All Yellow Pages, White Pages, online directories, and other business listings that display or contain any of the telephone numbers listed or described in paragraphs 1 or 2 above;

4. All web sites, web pages, social media pages, web logs, banners, URLs, domain names, advertisements (including pay-per-click and Google keyword search programs and similar advertising programs), and other services and hyperlinks that (i) contain or display any of Franchisor's Marks, or (ii) use any of Franchisor's Marks as search keywords or metatags, or (iii) promote or relate to any GROWTH COACH Franchise, or (iv) link to or from Franchisor's web site (currently www.thegrowthcoach.com) or any other web site or web page owned, established, or controlled by Franchisor or its other franchisees; and

5. All comments or postings by the Principal on any web site, web page, social media site, web log, forum or discussion group, if the comment or posting contains or references any of Franchisor's Marks or a hyperlink to or from Franchisor's web site (currently www.thegrowthcoach.com) or any other web site or web page owned, established, or controlled by Franchisor or its other franchisees.

Each Principal hereby grants Franchisor full power and authority to transfer, modify, cancel or remove any service, listing, link, registration or posting described above and to execute and deliver on the Principal's behalf any Transfer of Service Agreement and all other transfer documentation required by any telephone service provider, Internet service provider, electronic mail service, domain registrar, online directory, communication provider, search engine, regulatory agency or other provider of services, or any other party.

Each Principal further grants Franchisor full power and authority to cancel, revoke and remove any trade name, assumed name, fictitious name, business name, trademark or equivalent registration filed in the name of the Principal with the Secretary of State, Attorney General, Department of Commerce, or other agency or office of any state, or filed with the clerk or recorder of any county of any state, if the registration includes the names GROWTH COACH or any of Franchisor's other Marks, and to execute and deliver on the Principal's behalf any cancellation, termination or modification request and all other documentation required by any such state or county office or any other party.

Each Principal further grants Franchisor full power and authority to do and perform any and all acts and things that, in Franchisor's sole and unfettered discretion, are necessary or advisable to be done in order to carry out the purposes of this Power of Attorney, as fully to all intents and purposes as the Principal might or could itself do, hereby ratifying and affirming all that Franchisor may lawfully do or cause to be done by virtue of this Power of Attorney and the powers herein granted.

During the term of this Power of Attorney, and regardless of whether a Principal has designated any other person to act as its attorney-in-fact or agent, no one dealing with Franchisor is required to ascertain the Franchisor's authority, see to the performance of the agency, or be responsible in any way for the proper application of funds or property paid or delivered to Franchisor or for the proper exercise of the authority granted to Franchisor hereunder. Anyone dealing with Franchisor shall be fully protected in acting and relying on Franchisor's certification that this Power of Attorney has not been revoked and is in full force and effect as of the date of such certification, and no Principal shall take any action against anyone who acts in reliance on such a certification or a copy of this Power of Attorney. Any instrument or document executed by Franchisor on behalf of any Principal will be deemed to include such a certification by Franchisor, whether or not expressed. This paragraph will survive the expiration of this Power of Attorney.

This Power of Attorney will expire on the twelfth anniversary of the date of the Franchise Agreement (indicated in paragraph C of the Preamble above). The expiration of this Power of Attorney will not affect the validity of any act of Franchisor that occurred before the date of expiration.

This instrument is to be construed and interpreted as an irrevocable Power of Attorney coupled with an interest. This Power of Attorney is a durable Power of Attorney and shall not be affected by the disability of any Principal or the lapse of time. The death of a Principal shall not revoke the power, authority or acts and actions of Franchisor who, without knowledge of the Principal's death, continues to act in good faith under this Power of Attorney, and any such actions so taken shall inure to the benefit of and be binding upon the Principal's heirs, successors, personal representatives and assigns. This Power of Attorney is delivered in the State of Ohio and the laws of the State of Ohio govern all questions as to the validity of this Power of Attorney and the construction of its provisions.

As used in this instrument, the term "Franchisor's Marks" means Franchisor's registered GROWTH COACH trademark and other trademarks owned by Franchisor. Throughout this instrument the singular includes the plural and vice versa and the masculine includes the feminine or neuter and vice versa, wherever and whenever the context may require.

PRINCIPALS

_____         _____
            Signature                                Signature

David S. Kelly                           _____
            Print Name                               Print Name

Date:_____            Date:_____

EXECUTION OF THIS INSTRUMENT BY EACH PRINCIPAL MUST BE NOTARIZED

STATE OF ___MD___, COUNTY OF ___Howard___

On ___12-18-2012___, before me, a Notary Public in and for said county and state, personally appeared ___David S Kelly___, known to me or proven to me by satisfactory evidence to be the person whose name is subscribed to the foregoing instrument as Principal, and acknowledged the signing thereof to be his/her voluntary act and deed for the uses and purposes described therein.

My commission expires 06-01-2017

_____
            NOTARY PUBLIC

STATE OF _____, COUNTY OF _____

On _____, before me, a Notary Public in and for said county and state, personally appeared _____, known to me or proven to me by satisfactory evidence to be the person whose name is subscribed to the foregoing instrument as Principal, and acknowledged the signing thereof to be his/her voluntary act and deed for the uses and purposes described therein.

_____
            NOTARY PUBLIC

Franchisor
G.C. FRANCHISING SYSTEMS, INC.

By:_____

Title:___CEO___

Date:___5/11/13___

# DISCLAIMER OF REPRESENTATIONS

G.C. Franchising Systems, Inc.
10700 Montgomery Road, Suite 300
Cincinnati, OH 45242

Dear Sir or Madam:

Concurrently herewith we are entering into a Franchise Agreement with you. By means of this letter, we are certifying that no representations, warranties or promises concerning the Growth Coach franchise we are acquiring have been made by G.C. Franchising Systems, Inc. or anyone acting on its behalf, other than those contained in the Franchise Agreement and the standard Franchise Disclosure Document. In particular, without limiting the foregoing, no representations or promises have been made to us concerning the financial prospects of the franchise we have acquired and we have received no information from G.C. Franchising Systems, Inc. or anyone acting on its behalf concerning financial results of other franchisees. Also, in particular, without limiting the foregoing, no representations or promises have been made to us concerning the amount of money necessary for our initial investment to acquire and operate our Growth Coach franchise other than those contained in the Franchise Agreement and the standard Franchise Disclosure Document. Nothing contained in this document shall act as a release, estoppel, or waiver of any liability arising under any state franchise registration or disclosure law. All representations requiring prospective franchisees to assent to a release, estoppel or waiver of any liability are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

Very truly yours,

FRANCHISEE(S):                                          Date: _12 | 17 | 2012_

_____                        _____
          Signature                                              Signature

_Davo S. Kell_                                         _____
          Print Name                                             Print Name

Address:                                               Address:

_319 S Bouloin Street_                                 _____

_Baltimore MD 21224_                                   _____

**MARYLAND ADDENDUM TO GROWTH COACH FRANCHISE AGREEMENT**

The following terms and conditions amend the Franchise Agreement to which this Addendum is attached, for the purpose of complying with the Maryland Franchise Registration and Disclosure Law, and are hereby incorporated into the Franchise Agreement by this reference. The terms of this Addendum control in the event of conflicting terms in the Franchise Agreement.

1.      A general release required as a condition of renewal and/or assignment/transfer shall not apply to any claim or liability arising under the Maryland Franchise Regulation and Disclosure Law.

2.      A franchisee may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

3.      Any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

4.      Section 18.11 is amended by adding the following sentence:

"The representations contained in this Section 18.11 are not intended to act, nor shall they act, as a release, estoppel, or waiver of any liability arising under the Maryland Franchise Registration and Disclosure Law."

The parties are signing this addendum concurrently with the Franchise Agreement to which it is attached.

FRANCHISEE(S):

_____
*Signature*


_____
*Signature*

FRANCHISOR:

G.C. FRANCHISING SYSTEMS, INC.


By: _____

Its: _____